BOLIN, Justice.
 

 Anna Breland, a minor, by and through her mother and next friend, Julie Breland, appeals from a summary judgment entered in favor of defendants Dr. Leonard Rich and Vision Partners, LLC, a professional corporation of which Dr. Rich is a member.
 

 Facts and Procedural History
 

 Anna was born on April 9, 2003, at the University of South Alabama Children’s and Women’s Hospital (hereinafter “USA”) in Mobile. Anna was born prematurely at 23 weeks gestation, and she weighed 12.87 ounces at birth. Because she was premature, Anna was admitted to USA’s Neonatal Intensive Care Unit (hereinafter “the NICU”) for treatment and care. Dr. Fabian Eyal was the medical director of the NICU.
 

 Anna’s prematurity placed her at risk of developing several serious medical conditions, including retinopathy of prematurity (hereinafter “ROP”), a condition that affects the normal growth of retinal blood vessels and can cause blindness in premature infants. ROP typically presents some time after birth. Because early diagnosis is critical for treatment to be successful, premature infants should be screened early and regularly for ROP. Anna was placed on the list of premature infants at risk for ROP by pediatric ophthalmologist Dr. Rich, the board-certified ophthalmologist consulted by the NICU.
 

 
 *805
 
 Dr. Rich would typically retrieve the NICU’s eye-exam book (a bound book containing the list of premature infants to be examined on a particular date) and would take the eye-exam book with him to each patient’s bedside. Dr. Rich would perform the ROP exam and would note his findings on an eye form, which would be left at the patient’s bedside for inclusion in the patient’s chart. Renée Rogers, nurse manager of the NICU, testified that the eye forms would sometimes be found in a stack on an unused desk in the NICU or that sometimes Dr. Rich would place the eye form in the chart. She also stated that several eye forms might be found at one patient’s bedside and that, on one occasion, an eye form was found in a restroom in the NICU. Dr. Rich would keep a copy of the eye form for his own office records. One section of the eye form contains a drawing of the different zones of the eyes where the various stages of ROP might be located during an eye examination along with separate sections to note other examination findings and information.
 

 After completing the eye form for a particular patient, Dr. Rich would transpose the diagnosis and follow-up-treatment information from each patient’s eye form into the bound eye-exam book. The eye-exam book contains dates, a list of the names of the patients in the NICU needing ROP exams, and an indication as to whether further examination is necessary. Dr. Rich used symbols to indicate whether further treatment was necessary on both the eye form and in the eye-exam book. One of those symbols was two dashes with circles around them to indicate that there was no ROP and that no follow-up ROP exam was necessary. After completing all the scheduled ROP exams each day, Dr. Rich would return the eye-exam book to the ward clerk’s desk. Dr. Rich stated that he was the only person to write diagnosis and treatment information in the eye-exam book and that he used the eye-exam book to make sure that he did not miss any appointments on a given day. Dr. Rich stated that since 1981 he had been writing notations on the eye form and then simultaneously taking that information regarding the diagnosis and any follow-up treatment and writing it in the eye-exam book. Thereafter, the ward clerk would open the eye-exam book to Dr. Rich’s entries and would schedule patients for follow-up ROP examinations as indicated.
 

 On May 21, 2003, Dr. Rich performed an ROP examination on Anna. He noted on the eye form that Anna should be examined again in two weeks. Dr. Rich then entered the same information in the eye-exam book beside Anna’s name. Using the eye-exam book, the ward clerk scheduled Anna for another ROP examination. On June 2, 2008, Dr. Rich examined Anna and entered his findings on the eye form. He indicated that Anna should be examined again in two weeks. Dr. Rich then recorded that information in the eye-exam book. The ward clerk, using the eye-exam book, placed Anna on the list of patients to be examined in two weeks. On June 16, 2003, Dr. Rich again examined Anna. Dr. Rich noted on his eye form “tube, 2wk,” indicating that Anna was on a ventilator and that she should be examined again in two weeks. However, Dr. Rich wrote in the eye-exam book next to Anna’s name that Anna was negative for ROP and that no further examinations were needed. Based on the notations in the eye-exam book, Anna was not placed on the list of patients to be examined in two weeks.
 

 On July 4, July 6, and July 9, 2003, nurse practitioners in the NICU observing Anna made notes that a follow-up ROP examination was due. This is because it had been approximately two weeks since Anna had had her last exam, and, because Dr. Rich did not always have appointments
 
 *806
 
 scheduled for exactly two weeks from the prior appointment, the NICU nurse practitioners would note that a follow-up exam was due. Dr. Eyal testified that, at that point, he would have checked the eye-exam book to see if another exam was necessary. Because Dr. Rich had indicated in the eye-exam book following his examination of Anna on June 16, 2003, that no further exam was necessary, Anna was not reexamined.
 

 Dr. Eyal testified that the progress notes made by the NICU nurse practitioners do not “trigger” exams; instead, the eye-exam book is the trigger for scheduling ROP examinations. He stated that the progress notes are often copied from one day to the next. Dr. Eyal testified that the NICU has relied upon the eye-exam book for 15 years because the eye-exam book stays in the NICU and cannot be misplaced, whereas the eye forms do not immediately appear in the patient’s chart and because charts are “thinned out” on a regular basis, possibly removing the eye form from the patient’s chart and placing the culled reports in a different place in the NICU. Dr. Eyal testified that Dr. Rich is the only person to write in the eye-exam book, which prevented a ward clerk from possibly misinterpreting Dr. Rich’s handwriting in transferring the notes from the eye form to the eye-exam book.
 

 On August 12, 2003, a NICU nurse practitioner discovered the conflict in the notations in Dr. Rich’s eye form and his notations in the eye-exam book. The conflicting notes were shown to Dr. Eyal, and he asked that Anna be reexamined for ROP. That same evening, Dr. Rich was in the NICU and he was notified that Anna needed another exam. After examining Anna, Dr. Rich discovered that Anna had stage III to stage IV ROP in both her eyes since her last exam on June 16, 2003. After being diagnosed with ROP, Anna went to a children’s hospital where she underwent several procedures and surgeries, but the ROP had progressed to such an extent that Anna’s retina in her right eye was completely detached and her retina in her left eye was only 10% attached. As a result, Anna was permanently blind.
 

 On December 3, 2007, Julie Breland, Anna’s mother, sued Dr. Rich, Vision Partners, Dr. Eyal, USA, and USA Health Services Foundation pursuant to the Alabama Medical Liability Act (“AMLA”).
 
 [1]
 
 USA moved for and was granted a summary judgment on the ground of sovereign immunity. Dr. Rich and Vision Partners filed a motion for a partial summary judgment. They based their motion upon the pleadings; Dr. Rich’s affidavit and excerpts from his deposition; excerpts from Dr. Eyal’s deposition; excerpts from nurse Rogers’s deposition; éxcerpts from ward clerk Shirley Mauldin’s deposition; USA’s eye-examination protocol for premature infants, dated December 1998 and revised May 2000; the June 16, 2003, eye form completed by Dr. Rich; and the nurse-practitioner notes contained in Anna’s medical record regarding her fourth ROP
 
 *807
 
 examination. Julie filed a response in opposition to the motion. In support of her opposition, she filed excerpts from certain depositions, Anna’s medical records, the eye-exam-book pages, and the affidavit of Dr. Richard Saunders, a pediatric ophthalmologist. Dr. Saunders’s affidavit provided, in pertinent part, as follows:
 

 “3. I have reviewed the medical records pertaining to Anna Breland. Prior to my execution of this Affidavit, I reviewed the following records and things relevant to the treatment of Anna Bre-land during the times made the basis of this case: University of South Alabama Children’s & Women’s Hospital’s Neonatal Intensive Care Unit (‘USA NICU’) Admission and Discharge summaries; USA NICU’s Neonatal Nurse Practitioner Progress Notes; Dr. Leonard Rich’s ROP eye examination forms (‘Eye Forms’) dated May 21, 2003, June 1, 2003, June 16, 2003 and August 12, 2003; USA NICU’s ROP Eye Examination Protocol dated 12/98 and revised 05/00; select records from the office chart of Dr. Leonard Rich; correspondence from Dr. Baker Hubbard regarding his treatment of Anna Breland; USA NICU’s ROP log book (‘Eye book’) entries for Anna Breland on May 21, 2003, June 2, 2003 and June 16, 2003; portions of the deposition of Dr. Fabian Eyal; and the deposition of Dr. Leonard Rich.
 

 “4. At all times relevant to the medical care that Dr. Leonard Rich provided to Anna Breland, and the time of the acts and/or omissions detailed herein, I was actively engaged in the practice of medicine as a specialist in pediatric ophthalmology and strabismus[;] I continue to be actively engaged in the practice of medicine as a specialist in pediatric ophthalmology and strabismus. I am familiar with the prevailing standards of care applicable to the national community of board-certified ophthalmologists performing ROP eye examinations and follow-up care and treatment for premature infants and/or patients in a NICU. My qualifications are set forth in more detail in my curriculum vitae, a copy of which is attached to this statement.
 

 “5. After reviewing all of the above-stated material relevant to Dr. Leonard Rich’s treatment of Anna Breland, it is my opinion, within a reasonable degree of medical certainty, that Dr. Rich’s care violated the applicable standards of care for a board-certified ophthalmologist performing ROP eye examinations and follow-up care of premature infants and/or infants in a neonatal care unit in the 2003 time frame.
 

 “6. First, Dr. Rich violated the applicable standards of care by failing to properly convey his request for a followup examination of Anna Breland after his June 16, 2003, eye examination was concluded. The applicable standard of care for a board-certified ophthalmologist performing ROP eye examinations in a NICU requires that information provided to physicians and staff regarding follow-up examinations (if required) be reliably and accurately conveyed in such a manner as to minimize the likelihood of misinterpretation or scheduling errors. The NICU had an eye examination protocol in place, but it was not followed. To that end, Dr. Rich typically wrote his clinical findings in the ROP Eye Book and knew that he was the person who was transcribing his findings into the Eye Book. The NICU staff and Dr. Eyal relied upon Dr. Rich’s notations in the Eye Book to schedule followup ROP eye examinations; On June 16, 2003, following Anna’s third ROP eye examination. Dr. Rich wrote conflicting information in the Eye Form, which is placed in the child’s medical record, and the Eye Book, which is reviewed by the Ward Clerk and, if necessary, by the
 
 *808
 
 neonatologist. Dr. Rich fell below the standard of care because he incorrectly and improperly recorded in the USA NICU Eye Book that Anna Breland required no follow-up eye examinations, although she remained at extremely high risk for developing blinding ROP. It is my opinion, within a reasonable degree of medical certainty, that Dr. Rich’s failure to properly convey his request for a follow-up ROP eye examination on June 16, 2003 was the proximate cause of a six (6) week lapse in the follow-up examinations and proper care of Anna Breland’s eyes, during which time she developed severe ROP in both eyes.
 

 “7. Second, Dr. Rich violated the applicable standards of care by failing to implement practices and procedures to safeguard against lapses in care of patients such as Anna Breland. The applicable standard of care for a board-certified ophthalmologist performing ROP eye examinations in a busy level 3 NICU requires that the pediatric ophthalmologist work closely with neo-natology services to establish criteria for ROP examinations, which should be clear, unambiguous, and minimize the risk of scheduling and other errors. In the present matter, there was an ROP Eye Exam Protocol in place during the time frame in question; however, that protocol was deficient as it failed to provide adequate safeguard against lapses in the follow-up examinations of infants within the NICU. The existence of a protocol does not abrogate the ophthalmologist of responsibility if reasonable board-certified ophthalmologists in the national medical community who perform ROP examinations would find the protocol deficient. Here, the protocol contained inadequate safeguards against patients ‘falling through the cracks’ since the Eye Book was relied upon to schedule follow-up examinations and there were no alternative safeguards or triggers to ensure follow-up eye examinations of children who needed them. Dr. Rich states that he relied upon the ward clerk — an individual with no medical training or experience — to interpret his medical record findings in order to schedule follow-up examinations. There were no other procedures or protocols employed by Dr. Rich in order to ensure that his requests for follow-up examinations were properly conveyed or carried out. Moreover, Dr. Rich failed to work with and consult neonatology services at USA NICU to formulate a protocol that included such necessary safeguards so as to prevent lapses in ROP examinations of patients within the NICU. It is my opinion, within a reasonable degree of medical certainty, that Dr. Rich’s failure to implement practices and procedures to safeguard against lapses in the care of patients such as Anna Breland proximately caused a six (6) week lapse in the follow-up examination and care of Anna Breland’s eyes, during which time she developed severe ROP in both eyes.
 

 “8. Third, Dr. Rich violated the applicable standards of care by failing to follow and provide follow-up care for his patient, Anna Breland. Treatment of ROP is most likely to be effective if applied during a relatively narrow treatment window which typically lasts 1 to 3 weeks as the disease is becoming severe, but prior to the development of a large amount of abnormal vascular tissue or the onset of retinal detachment. For this reason, it is essential that screening examinations be performed on all high risk infants and repeated as necessary based on ocular findings until the risk for developing severe disease has passed. The applicable standard of care for a board-certified ophthalmologist performing ROP eye examinations in a NICU requires that needed follow-up
 
 *809
 
 examinations were scheduled and actually performed. In the present case, Dr. Rich had an ongoing patient-physician relationship with Anna Breland beginning with his first examination on May 21, 2003. Despite that ongoing relationship, Dr. Rich failed to assure that follow-up examinations of Anna Breland would occur as requested and, when she failed to re-appear on the examination list, he further failed to conduct any investigation as to why she was no longer on the list. It is my opinion, within a reasonable degree of medical certainty, that Dr. Rich’s failure to follow and provide follow-up care and treatment to Anna Breland following her June 16, 2003, eye exam proximately caused the lapse in her care and her development of severe ROP in both eyes.
 

 “9. Finally, Dr. Rich violated the applicable standards of care by failing to properly document his eye exam findings on Anna Breland’s medical records. The applicable standard of care for a board-certified ophthalmologist performing ROP eye examinations in a NICU requires that the ophthalmologist identify and record the location and sequential retinal changes on the medical record using the International Classification of Retinopathy of Prematurity. Dr. Rich’s eye examination records were generally inadequate in that they contained minimal information and provided no indication as to why this information was lacking on the June 2nd and June 16th examinations. Specifically, Dr. Rich failed to make any drawings, notations, or clear documentation regarding presence or absence of ROP or the zone of retinal vascular maturity, which is exceeding important in determining risk and an appropriate follow-up interval. The terminology used in the Eye Form that ‘Blank = normal’ is inadequate. It is my opinion within a reasonable degree of medical certainty that Dr. Rich’s failure to properly document the results of his ROP eye examination on the eye exam record fell below the applicable standard of care for a board-certified ophthalmologist performing ROP eye examinations on premature infants.
 

 “10. As set forth herein, it is my opinion, following a review of the aforementioned medical records, documentation, and other items pertinent to the treatment and care of Anna Breland, that Dr. Rich failed to exercise such reasonable care, skill and diligence as other similarly-situated healthcare providers in the same general line of practice ordinarily exercise in a similar case. It is further my opinion that the various deviations from the applicable standards of care by Dr. Rich in this case proximately caused Anna Breland’s injuries and damages.”
 

 On July 28, 2009, the trial court denied Dr. Rich and Visions Partners’ motion for a partial summary judgment. Subsequently, Dr. Rich deposed Dr. Saunders. At his deposition, Dr. Saunders testified, in pertinent part, as follows:
 

 “Q. [Counsel for Dr. Eyal and USA Health Services Foundation:] Dr. Rich should have assessed Anna’s eyes for ROP every two weeks until he saw full vascularization of the retinas regardless of what he wrote on any medical form, correct?
 

 “A. Not necessarily two weeks, but, again, there should have been recurrent examinations at appropriate intervals.
 

 “Q. Let me ask this: Dr. Rich should have assessed Anna’s eyes for ROP on a recurrent basis until he saw full vascularization of her retinas regardless of what he wrote on any medical form, correct?
 

 “[Counsel for Dr. Rich and Vision Partners]: Object to the form.
 

 
 *810
 
 “A. Or until the child was out of risk for retinal detachment.
 

 “Q. And any failure on the part of Dr. Rich to assess Anna’s eyes for ROP on a recurrent basis until such time constituted a deviation from the standard of care applicable to a pediatric ophthalmologist, correct?
 

 “[Counsel for Dr. Rich and Vision Partners]: Object to the form.
 

 “A. Only to the extent that he remained her eye doctor and the care was not transferred to another appropriately qualified individual, yes.
 

 “Q. And it’s your opinion in this case that Dr. Rich remained Anna Breland’s pediatric ophthalmologist throughout her hospitalization from May, June, July and August 2008 at Children’s & Women’s Hospital, correct?
 

 “A. Yes.
 

 “Q. You see nowhere in the record where Dr. Rich transferred the pediatric ophthalmology care of Anna Breland to another ophthalmologist, correct?
 

 “A. Correct.
 

 “Q. By deviating from the standard of care applicable to pediatric ophthalmologists in failing to assess Anna’s eyes on a recurrent basis until there was full vascularization, Dr. Rich caused Anna to develop severe ROP which was essentially untreatable by the time the disease was finally detected, correct?
 

 “[Counsel for Dr. Rich and Vision Partners]: Object to the form.
 

 “A. There was more than one cause, I think, but that was certainly one of the causes.
 

 “Q. If Anna Breland is blind today, then Dr. Rich’s deviation from the standard of care in failing to assess her eyes for ROP on a recurrent basis until she had full vascularization of her retinas was a cause of Anna Breland’s blindness, correct?
 

 “[Counsel for Dr. Rich and Vision Partners]: Object to the form.
 

 “A. Without — Recurrent eye examinations prompted by any method, more likely than not, would have prevented the child from going blind.
 

 “Q. I don’t understand. Let me ask my question again and see if you can incorporate that and explain it to me a little better. If Anna Breland is blind today, then Dr. Rich’s deviation from the standard of care in failing to assess her eyes on a recurrent basis until full vascularization of her retinas caused Anna Breland’s blindness; isn’t that right?
 

 “[Counsel for Dr. Rich and Vision Partners]: Object to the form.
 

 “A. Well, one of the number of causes, but ultimately the failure to examine the child was the cause of the blindness since an examination would have prompted treatment, more likely than not, which would have resulted in salvaged vision.
 

 “Q. If the eye-exam book, Dr. Saunders, is the appointment book, then when Dr. Rich wrote a symbol meaning no further follow-up examination for Anna Breland on June 17 [sic], 2003, then Dr. Rich took Anna Breland out of the eye reexamination schedule, correct?
 

 “[Counsel for Dr. Rich and Vision Partners]: Object to the form.
 

 “A. He indicated that he did not— presumably in error — he did not want a follow-up.
 

 “Q. Okay. And my question is, assuming that the ward clerk prepares a follow-up examination schedule based on what Dr. Rich writes in the eye book, then by writing no further follow-up or a symbol for that, Dr. Rich took Anna out of the follow-up scheduling from the ward clerk, correct?
 

 
 *811
 
 “[Counsel for Dr. Rich and Vision Partners]: Object to the form.
 

 “A. He did not request a follow-up, and unless it was picked up, the error was picked up by some other methodology, the child likely would not have been followed up.
 

 “Q. But, as I understand your testimony, even though Dr. Rich incorrectly wrote no follow-up necessary in the eye appointment book on June 17 [sic], 2003 resulting in Anna not getting a scheduled follow-up, Dr. Rich should have, nonetheless, seen Anna on June 30th, 2003 for a ROP examination, correct?
 

 “[Counsel for Dr. Rich and Vision Partners]: Object to the form of the question.
 

 “A. The child should have been examined. It was his responsibility to make sure that happened, not his exclusive responsibility, but his responsibility.
 

 “Q. Now, if you look again at the protocol, Doctor, don’t you agree that it would have been superfluous for the ward clerk to rewrite data from the eye form in the eye book because Dr. Rich had already done it in this case, correct?
 

 “A. Yes. Actually, that would have been a very difficult system because the ward clerk would then have to be interpreting medical records.
 

 “Q. And it’s my understanding that it’s your opinion that it was a better practice for Dr. Rich to personally transfer data regarding the patient’s eye care from the eye form into the eye book because a ward clerk would not have to interpret his notes in the eye form, correct?
 

 “A. Yes.
 

 “Q. Now, by personally writing in the eye-exam book writing about his finding and recommendations for followup of a patient for eye care, Dr. Rich failed to follow the eye exam protocol, if you assume that the word ‘note’ in [section] G means to write, correct?
 

 “[Counsel for Dr. Rich and Vision Partners]: Object to the form of the question.
 

 “A. Yes. I think that’s true as well.
 

 “Q. I mean. If Dr. Rich would not have written in the eye-exam book and just let the ward clerk go to the eye form and get the information, then she probably would have done it correctly, right, and not made the mistake he did, correct?
 

 “A. If it were left blank rather than incorrect information being logged, it would be more likely than not that the need for follow-up examination would have been identified.
 

 “Q. She probably would not have made the same mistake that Dr. Rich made, correct?
 

 “A. That’s correct. In this one — as a single instance, because it wouldn’t have been likely they both would have made an error.
 

 “Q. I think you’ve already agreed with this, but let me ask again. Dr. Rich’s note in the eye-exam book on June 17 [sic], 2003, ‘No follow-up examination,’ made certain that Anna would not be regularly scheduled for an eye appointment on or about June 30th, 2003, correct?
 

 “[Counsel for Dr. Rich and Vision Partners]: Object to the form.
 

 “[Other counsel for Dr. Rich and Vision Partners]: Object to the form.
 

 “Q. Isn’t that correct?
 

 “[Counsel for Dr. Rich and Vision Partners]: Object to the form.
 

 “A. Well, it wasn’t written that way but a symbol indicating no follow-up. It didn’t make it certain, but it made it unlikely, unless the error was detected, that the child would receive the follow
 
 *812
 
 up, given the system that was actually being used.
 

 “Q. In your opinion, did Dr. Rich deviate from the standard of care applicable to a pediatric ophthalmologist on June 16 or 17, 2003 by writing in the eye-exam book that no follow-up care or assessment of Anna’s eyes were necessary?
 

 “[Counsel for Dr. Rich and Vision Partners]: Object to the form.
 

 “A. Yes.
 

 “Q. And that deviation of the standard of care on the part of Dr. Rich caused her blindness, correct?
 

 “[Counsel for Dr. Rich and Vision Partners]: Object to the form.
 

 “A. Without that — Let’s rephrase that. Had it been noted correctly, the child would have been followed up appropriately, more likely than not.
 

 “Q. And barring something, some unforeseeable, unreasonable event, then Anna Breland would not have developed severe stage III ROP and possible blindness, correct?
 

 “[Counsel for Dr. Rich and Vision Partners]: Object to the form.
 

 “A. She would have had about an 80 percent chance of salvage with timely treatment.”
 

 On January 27, 2010, Dr. Rich and Vision Partners filed another summary-judgment motion, arguing that Dr. Saunders failed to establish that Dr. Rich’s negligence proximately and probably caused the lapse in Anna’s ROP examinations and treatment. Dr. Rich argued that, in examining the facts regarding the scheduling of ROP examinations, Dr. Saunders identified numerous possible causes of the missed ROP exam, but that none of these causes were opined by him to have been the probable or proximate cause.
 
 [2]
 
 Julie filed a response in opposition to the motion. On March 8, 2010, the trial court granted the motion. On March 12, 2010, Julie reached a settlement with Dr. Eyal and USA Health Services Foundation. On April 30, 2010, the trial court approved the settlement.
 

 Julie filed a timely Rule 59(e), Ala. R. Civ. P., motion to alter, amend, or vacate the summary judgment in favor of Dr. Rich and Vision Partners. Attached to the motion was a supplemental affidavit from Dr. Saunders, which provided, in pertinent part:
 

 “2. In my previous Affidavit and subsequent deposition testimony, I indicated that there were a number of breaches of the standards of care by Dr. Rich that contributed to Anna Breland’s blindness. However, my deposition testimony from November 16, 2009 wherein I state there were multiple ‘causes’ of Anna’s blindness (p. 186, lines 2-6) was in response to a question posed by defense counsel as to whether ‘Dr. Rich caused Anna to develop severe ROP.’ (p. 185, lines 1-2). Clearly Dr. Rich did not cause Anna’s eye disease, which is produced by severe prematurity as well as numerous other medical factors (i.e.,
 
 *813
 
 ‘causes’). However, the proximate cause of the child’s blindness is another matter, and I stated unambiguously: ‘ultimately, the failure to examine the child was the cause of the blindness, since an examination would have prompted treatment, more likely than not, which would have resulted in salvaged vision.’ (p. 816, lines 8-6). Simply stated, Dr. Rich failed to re-examine Anna’s eyes when she was still at risk for developing blinding retinopathy of prematurity. This lapse in examination would not have occurred except that Dr. Rich improperly recorded his examination findings and need for follow-up in the ‘Eye Book’ on June 16, 2003. The Eye Book was the tracking method relied on by Dr. Rich, Dr. Eyal, and the nursery staff to schedule follow-up examinations for ROP. This acknowledged error by Dr. Rich directly resulted in Anna Breland’s eyes not being examined two weeks later, as was required by the standard of care at that time. Since no examination was performed, there was no method of detecting her advancing ROP, which would have been detected had this examination, and subsequent required eye examinations, been performed. Even though the ROP became severe enough to warrant laser treatment, no treatment was offered when the disease was curable, and the opportunity to save her vision was permanently lost.
 

 “8. It is my opinion, within a reasonable degree of medical certainty, that timely laser treatment prior to August 1, 2003, would most likely have been effective in preventing retinal detachment in both of Anna Breland’s eyes. In the absence of this treatment, both eyes developed inoperable retinal detachment. These retinal detachments have rendered the child permanently and incurably blind.
 

 “4. Thus, as stated in my previous Affidavit to this Court and as I testified in my deposition in this case, it is my opinion within a reasonable degree of medical certainty that Dr. Rich’s failure to examine and monitor Anna Breland’s eyes, as required by the standard of care, was the probable and proximate cause of the child’s blindness.”
 

 The trial court denied the motion, and Julie timely appealed.
 

 Standard of Review
 

 Our standard of review of a summary judgment is well settled:
 

 “ ‘The standard of review applicable to a summary judgment is the same as the standard for granting the motion....’
 
 McClendon v. Mountain Top Indoor Flea Market, Inc.,
 
 601 So.2d 957, 958 (Ala.1992).
 

 “ ‘A summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. The burden is on the moving party to make a prima facie showing that there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law. In determining whether the movant has carried that burden, the court is to view the evidence in a light most favorable to the nonmoving party and to draw all reasonable inferences in favor of that party. To defeat a properly supported summary judgment motion, the nonmoving party must present “substantial evidence” creating a genuine issue of material fact — “evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” Ala.Code 1975, § 12-21-12;
 
 West v. Founders Life Assurance Co. of Florida,
 
 547 So.2d 870, 871 (Ala.1989).’
 

 
 *814
 

 “Capital Alliance Ins. Co. v. Thorough-Clean, Inc.,
 
 639 So.2d 1349, 1350 (Ala.1994). Questions of law are reviewed de novo.
 
 Alabama Republican Party v. McGinley,
 
 893 So.2d 337, 342 (Ala.2004).”
 

 Pritchett v. ICN Med. Alliance, Inc.,
 
 938 So.2d 933, 935 (Ala.2006).
 

 Issues Presented
 

 Julie argues that she demonstrated a genuine issue of material fact by presenting substantial evidence that Dr. Rich’s negligence proximately caused Anna’s blindness because Dr. Saunders’s testimony, viewed as a whole, stated that the lapse between the June 16, 2003, examination and the ultimate treatment resulted in Anna’s blindness and that Dr. Rich caused that delay by failing to properly request a follow-up ROP examination on June 16, 2003, instead indicating that no follow-up examination was necessary. Julie argues that Dr. Rich and Vision Partners, in seeking a summary judgment, raised the issue of combined and concurring negligence and attempted to avoid responsibility by asserting that other parties were at fault and that those parties proximately caused Anna’s blindness. Dr. Rich and Vision Partners argue that Julie’s expert, Dr. Saunders, testified that Dr. Rich’s negligence was one of a number of causes resulting in Anna’s eye examination being delayed and that none of the causes was identified by Dr. Saunders as the probable or most likely cause of Anna’s injury. They further argue that because no cause has been identified, Dr. Rich’s alleged negligence does not constitute a cause that can be combined and concurred with any other cause alleged by Julie, and that, even if the concept of combined and concurring negligence were applicable, it has fallen into desuetude in medical-malpractice actions. Accordingly, the issues presented in this appeal are whether Julie presented substantial evidence that Dr. Rich breached the applicable standard of care, which breach proximately caused Anna’s injury, and, if so, whether evidence of combined and concurring negligence of more than one defendant for a single injury diminishes Dr. Rich’s liability.
 

 Discussion
 

 The AMLA, at § 6-5-548(a), Ala.Code 1975, provides, in relevant part:
 

 “In any action for injury ... against a health care provider for breach of the standard of care, the plaintiff shall have the burden of proving by substantial evidence that the health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice ordinarily have and exercise in a like case.”
 

 “To prevail on a medical-malpractice claim, a plaintiff must prove ‘ “1) the appropriate standard of care, 2) the doctor’s deviation from that standard, and 3) a proximate causal connection between the doctor’s act or omission constituting the breach and the injury sustained by the plaintiff.” ’
 
 Pruitt [v.
 
 Zeiger], 590 So.2d [236,] 238 [ (Ala.1991) ] (quoting
 
 Bradford v. McGee,
 
 534 So.2d 1076, 1079 (Ala.1988)).”
 
 Giles v. Brookwood Health Servs., Inc.,
 
 5 So.3d 533, 549 (Ala.2008).
 

 “A plaintiff in a medical-malpractice action must ... present expert testimony establishing a causal connection between the defendant’s act or omission constituting the alleged breach and the injury suffered by the plaintiff.
 
 Pruitt v. Zeiger,
 
 590 So.2d 236, 238 (Ala.1991). See also
 
 Bradley v. Miller,
 
 878 So.2d 262, 266 (Ala.2003);
 
 University of Alabama Health Servs. Found., P.C. v. Bush,
 
 638 So.2d 794, 802 (Ala.1994); and
 
 Bradford v. McGee,
 
 534 So.2d 1076, 1079 (Ala.1988). To prove causation in a medical-malpractice case, the plaintiff
 
 *815
 
 must demonstrate 1 “that the alleged negligence probably caused, rather than only possibly caused, the plaintiffs injury.” ’
 
 Bradley,
 
 878 So.2d at 266 (quoting
 
 University of Alabama Health Servs.,
 
 638 So.2d at 802).”
 

 Sorrell v. King,
 
 946 So.2d 854, 862 (Ala.2006).
 

 Out the outset, with regard to proximate cause, we note that Dr. Rich and Vision Partners argue that Dr. Saunders failed to identify the proximate cause of the lapse in examinations after June 16, 2003. Julie argues that they are improperly characterizing the delay in examining Anna’s eyes as Anna’s injury and that, instead, Anna’s compensable injury is the blindness she suffered as a result of untreated ROP caused by the delay in her eye examination. This Court has discussed proximate cause in cases where a delay in diagnosis and/or treatment was an issue.
 

 In
 
 Parker v. Collins,
 
 605 So.2d 824 (Ala.1992), Joyce Parker discovered a lump in her breast and underwent a mammogram. Dr. Collins, a radiologist, interpreted the test results as negative for cancer. Subsequent surgery resulted in the removal of her breast and several mammary glands, which were found to be cancerous. Parker underwent chemotherapy and radiation to destroy any cancer cells that might have spread into her lymph nodes. Parker and her husband sued Dr. Collins, alleging that he negligently performed a mammogram and that he negligently interpreted those test results. The Parkers further argued that had Mrs. Parker’s cancer been detected earlier, she could have avoided undergoing chemotherapy and radiation treatments and that her chance of long-term survival would have been much better. At trial, the Parkers submitted the expert testimony of several radiologists who stated that the X-ray film Dr. Collins had used to make his diagnosis was “grossly inadequate” and that Dr. Collins violated the standard of care by basing his diagnosis on the film. The Parkers presented testimony from a cancer specialist who stated that, based on the size of the lump in January 1988 (when Dr. Collins performed the mammogram) and the medical evidence of the subsequent growth of the lump, “he was 80% certain that the cancer had not spread into Mrs. Parker’s lymph nodes as of January [1988].” 605 So.2d at 826. Mrs. Parker’s surgeon testified that her “mastectomy and the course of chemotherapy and radiation treatments that followed were necessary, because the cancer had spread into her lymph nodes” and that “breast cancer has a higher rate of recurrence once it has spread into the lymph glands.” Id At the close of the Parkers’ evidence, the trial court granted Dr. Collins’s motion for a directed verdict
 
 [3]
 
 on the ground that the Parkers had failed to establish the element of proximate causation because they presented no evidence indicating that Dr. Collins’s incorrect interpretation of the substandard mammogram caused Mrs. Parker to undergo a course of treatment she would not have had to endure in January 1988 had the proper diagnosis been made.
 

 On appeal, this Court reversed the judgment of the trial court, holding that the Parkers had provided sufficient evidence to create a jury question as to the proximate cause of Mrs. Parker’s injuries. At the outset of this Court’s discussion, we cited the established principle that “the issue of causation in a malpractice case may properly be submitted to the jury where there is evidence that prompt diagnosis and treatment would have placed the patient in a better position than she was in as a result of the inferior medical care.”
 
 *816
 
 605 So.2d at 827 (citing
 
 Waddell v. Jordan,
 
 293 Ala. 256, 302 So.2d 74 (1974);
 
 Murdoch v. Thomas,
 
 404 So.2d 580 (Ala.1981)). “It is not necessary to establish that prompt care would have prevented the injury or death of the patient; rather, the plaintiff must produce evidence to show that her condition was adversely affected by the alleged negligence.”
 
 Id.
 
 This Court then held:
 

 “While the facts do not establish that Mrs. Parker’s cancer could have been prevented altogether if Dr. Collins had rendered a prompt diagnosis based on a clearer X-ray, medical testimony suggests that Mrs. Parker’s condition worsened as a direct result of a diagnosis based upon a substandard X-ray. That evidence was sufficient to create a jury question as to proximate cause in this case; accordingly, we reverse that portion of the judgment based on the directed verdict for Dr. Collins.”
 

 605 So.2d at 827.
 

 McAfee v. Baptist Medical Center,
 
 641 So.2d 265 (Ala.1994), involved the consolidated appeals of two medical-malpractice plaintiffs. One plaintiff was Martin McAfee, an infant who “developed bacterial meningitis and suffered permanent brain damage and vision impairment” as a result of the alleged malpractice of his neonatologist. 641 So.2d at 266. The other plaintiff was Brenda Roberts, who developed breast cancer, which she alleged her radiologists failed to discover.
 
 Id.
 
 McAfee alleged that Baptist Medical Center and others (collectively referred to as “Baptist Medical”) “failed to recognize, appreciate, and treat [his] bacterial infection in a timely manner, ... [resulting] in a worsening of [his] condition.”
 
 Id.
 
 Similarly, Roberts alleged that Life Diagnostic Radiology and others “fail[ed] to properly evaluate [a] lump ... found in [her] right breast ... [resulting] in a one-year delay of treatment and ... an unnecessary worsening of her condition.”
 
 Id.
 
 In each case, the trial court granted the defendants’ summary-judgment motions. This Court affirmed both summary judgments, explaining:
 

 “We have carefully studied the record in each of the cases before us and in both cases we conclude that the defendants made a prima facie showing that they were entitled to a judgment as a matter of law on the issue of causation by producing evidence that their actions did not cause the patient’s condition to worsen. In neither case did the plaintiffs submit substantial evidence that the patient’s condition worsened as a direct result of the actions of the defendant physicians.
 

 “In the first case, the baby, Martin McAfee, contracted meningitis from bacteria. He was treated by Dr. Rodney Dorand. Dr. Dorand, a board certified neonatologist, submitted an affidavit stating that he was familiar with the degree of care, skill, and diligence normally exercised by physicians practicing neonatology in 1990, and that, in his opinion, nothing he did or did not do in his care and treatment of Martin McAf-ee probably caused or contributed to cause any injury. The affidavit of the plaintiffs’ expert, Dr. O. Carter Snead III, offered a conjectural observation that, generally, the sooner the onset of treatment, the better the expected result. There is no evidence that the actions of Dr. Dorand or those of Dr. Gillis Payne, who first saw the baby, probably caused the poor outcome. In the second case, the plaintiffs submitted affidavits stating, generally, that ‘time is of the essence’ in treating breast cancer, and that patients who receive earlier treatment obtain a better result. There was no expert testimony to rebut the testimony submitted by the defendants indicating that the metastasis to the lymph nodes probably occurred in the early stages before the cancer could be diag
 
 *817
 
 nosed. The affidavits of the plaintiffs’ experts did not rise to the level of substantial evidence that the actions of the defendants probably caused Brenda Roberts’s injuries.”
 

 641 So.2d at 267-68. In other words, the general statements proffered by McAfee and Roberts — that “time [was] of the essence” and that “the sooner the onset of treatment, the better the expected result” — did not constitute substantial evidence that any of the physicians charged in
 
 McAfee
 
 with medical malpractice probably caused the plaintiffs’ injuries.
 

 In
 
 Shanes v. Kiser,
 
 729 So.2d 319, 320 (Ala.1999), the plaintiff alleged that an emergency-room physician failed to diagnose and treat her mother’s “heart-related problem” while her mother was in the emergency room. The mother was released and was later found dead in her home. No autopsy was performed, and both the emergency-room physician and the plaintiffs expert identified other possible causes for the mother’s death. The plaintiff’s expert expressed the opinion that the mother had died of a heart attack based on statistical data “suggesting that more people die each year of heart-related problems than any other cause” and on the fact that the mother had exhibited symptoms in the emergency room that might suggest a heart-related problem. 729 So.2d at 322. This Court wrote:
 

 “More specifically, [the plaintiff] based her theory of the case — and, consequently, her expert testimony — solely on the assumption that [her mother] died of heart failure, which fact was never established. All of [the plaintiffs expert]’s testimony as to the breach of the standard of care related to what might have been done to prevent, or reduce the effects of a heart attack. Significantly, if, in fact [the mother] died of one of the other three possible causes discussed, then the record provides no evidence as to the standard of care allegedly breached, that is, as to what [the emergency-room doctor] should have done under those circumstances to prevent [the mother]’s death or to reduce the effects of the malady. If [the mother] died of a condition not heart-related, then [the plaintiff] presented no evidence as to how [the emergency-room doctor] breached the standard of care relevant to that condition.”
 

 729 So.2d at 323-24 (emphasis omitted).
 

 DCH Healthcare Authority v. Duckworth,
 
 883 So.2d 1214 (Ala.2003), also involved a delay in diagnosis and treatment. In
 
 Duckworth,
 
 Dee Duckworth was injured on October 9, 1999, when he fell on an escalator at a medical center. He was taken to the emergency room of the medical center at 11:00 a.m. Dr. Malcolm Nelson, the emergency-room physician, examined Mr. Duckworth and ordered an X-ray examination, which began at 12:36 p.m. For approximately 45 minutes preceding the X-ray examination, Mr. Duckworth waited in the hallway of the radiology department. While he was waiting, he developed a headache and nausea. He vomited during and after the X-ray examination. At 1:17 p.m., Dr. Nelson ordered a computerized tomography scan (“CT scan”), which was performed at 1:54 p.m. At 2:00 p.m., the radiology department notified emergency-room personnel that Mr. Duck-worth had a subdural hematoma. At approximately 2:15 p.m., Mr. Duckworth was relocated to the critical-care unit and neurosurgeon Dr. Moses Jones was called to relieve the hemorrhage. Dr. Jones arrived at the medical center at approximately 3:15 p.m. Surgery began at 4:40 p.m. and was completed at 6:00 p.m. Mr. Duckworth remained hospitalized until October 22, 1999, when he died as a result of the injuries he sustained in the fall.
 

 Mary Duckworth, his wife, sued the medical center. Her theory of the case
 
 *818
 
 was that the medical center’s diagnosis of her husband’s condition and its treatment were dilatory. More specifically, she complained that the failure of emergency-room personnel to respond timely and appropriately to her husband’s visibly deteriorating condition over a three-hour period was inferior care and adversely affected his condition, namely, the subdural hematoma, from which he subsequently died. During the trial of the case, the medical center moved for a judgment as a matter of law (“JML”) at the close of Mrs. Duckworth’s evidence and again at the close of all the evidence. As a ground for the motions, the medical center asserted that Mrs. Duckworth failed to present substantial evidence of causation by expert testimony. The trial court denied the motions, and a jury awarded Mrs. Duckworth $350,000. The medical center filed a postverdict motion for a JML. That motion was overruled by operation of law, and the medical center appealed. On appeal, this Court reversed the judgment of the trial court, stating:
 

 “As to causation in a dilatory-diagnosis-and-treatment case such as this one, ‘an action “may properly be submitted to the jury where there is evidence that prompt diagnosis and treatment would have placed the patient in a
 
 better position
 
 than she was in as a result of inferior medical care.” ’
 
 Shanes v. Kiser,
 
 729 So.2d 319, 320-21 (Ala.1999) (quoting
 
 Parker [v.
 
 Collins], 605 So.2d [824] at 827 [ (Ala.1992) ]) (emphasis added). ‘It is not necessary to establish that prompt care could have
 
 prevented
 
 the injury or
 
 death
 
 of the patient; rather, the plaintiff must produce evidence to show that her condition was adversely affected by the alleged negligence.’
 
 Parker,
 
 605 So.2d at 827 (emphasis added). Unless ‘the cause and effect relationship between the breach of the standard of care and the subsequent complication or injury is so readily understood that a layperson can reliably determine the issue of causation,’ causation in a medical-malpractice case must be established through expert testimony.
 
 Cain v. Howorth,
 
 877 So.2d 566, 576 (Ala.2003); see also
 
 Bradley v. Miller,
 
 878 So.2d 262 (Ala.2003);
 
 Rivard v. University of Alabama Health Sens. Found., P.C.,
 
 835 So.2d 987 (Ala.2002).”
 

 883 So.2d at 1217-18.
 

 In
 
 Duckworth,
 
 Dr. Jones, who performed the surgery on Mr. Duckworth, testified, in pertinent part, as follows:
 

 “ ‘Q. [Counsel for the medical center:] In your opinion, in your medical opinion, doctor, to a reasonable degree of certainty, would Mr. Duckworth’s outcome have been what it was?
 

 “ ‘A. Certainly. I see nothing about this course of events that tells me we could have corrected anything here by a time factor. You can always go back and say, well, is there some other management approach you could have takén, and it’s a second guess. But, then, every time you try one of these other things, you can find other complications that could have or might have arfisen]. So, sure, I don’t see anything different to change.’
 

 “ ‘Q. [Mrs. Duckworth’s counsel:] The timing within which a surgeon can evacuate a hematoma like Mr. Duckworth had has some effect on the likelihood of a good outcome, doesn’t it?
 

 “ ‘A. [Dr. Jones:] Certainly.
 

 “ ‘Q. You want to get to it as soon as possible?
 

 “ ‘A. That’s always the ideal, yes.
 

 “ ‘Q. Regardless of whether it’s an elderly patient or an adolescent?
 

 “ ‘A. That’s correct.
 

 
 *819
 
 “ ‘Q. When you say that subdural hematomas like Mr. Duckworth suffered from are known to have an 80% mortality rate, timing of surgical intervention and relieving the pressure has an effect on improving the likelihood of a better outcome?
 

 “ ‘A. That’s correct. Certainly, if you operate on it next week as opposed to today, that makes a big, big difference.
 

 “ ‘Q. Well, and hours can make a difference, can’t it.
 

 “ A. All the studies show — well, I shouldn’t say all the studies, but the standard of — by head-injury studies, put it that way, have shown that you basically have a major change in mortality based on an eight-hour window after discovery of the subdural. Now that’s not necessarily after the injury.
 

 “ A. Because you don’t have a precise time when the bleeding started. ...
 

 “ ‘Q. Doctor, with this patient, taking in consideration specifically with a history of this fall and injury to his head on the escalator and his resulting course, can you tell us, in your opinion, when his hematoma began to form in the subdural region?
 

 “ A. I have no clue. I can’t — I can only tell you where it was at the time when we did the CT [scan],
 

 “ ‘Q. Would you expect that the subdural hematoma that you encountered and which you described as being large would have been smaller or less involved with bleeding two hours earlier?
 

 “ A. I would expect so, but I have no way of knowing that.
 

 “ ‘Q. I mean, scientifically, as a neurosurgeon, you would expect that probability?
 

 “A. I think that’s a reasonable expectation, yeah. I think that you could possibly say that it was smaller two hours earlier than it was at the time I saw him.
 

 “ ‘Q. But if I’m understanding your specialty and your practice correctly, physicians like yourself, who are trained to deal with these intra-cranial bleeds, want to evacuate the bleed at the earliest time to reduce the harm?
 

 “ A. Right. And we have to have a window of opportunity to do that and that’s why I said that the usual considered window of opportunity, and this is not an absolute. Obviously, you don’t sit around and wait for eight hours to occur. But if you can get a subdural hematoma evacuated within that basically eight-hour window, the statistics show that those people survive better.
 

 “ ‘Q. [Dr. Nelson] had told us [in] his deposition when he was asked, generally, with a subdural bleed like Mr. Duckworth had, any delay in diagnosis can adversely affect a person’s condition, and he said: “Yes, sir.” Would you agree with that in general?
 

 “A. Yes. I think we’ve already said that.’ ”
 

 883 So.2d at 1218-20 (emphasis omitted). The
 
 Duckworth
 
 Court stated:
 

 “Conspicuously absent from this testimony is any opinion as to how — or whether — the two- or three-hour diagnostic, or preoperative, period of which Mrs. Duckworth complains probably affected the outcome of this case. On the contrary, Dr. Jones testified that there was an optimum period of eight hours between diagnosis and surgery. The hematoma was discovered at 2:00 p.m. and removed by 6:00 p.m. Even com
 
 *820
 
 puting the time from 10:24 a.m., when Duckworth arrived at the emergency room, until the hematoma was evacuated, only 7 1/2 hours occurred before the surgery — within the optimum treatment period Dr. Jones described. Although Dr. Jones conceded that the hematoma ‘could possibly [have been] smaller two hours earlier,’ he did not explain how an increase in size would have adversely affected Mr. Duckworth’s ultimate condition. He agreed with the general proposition that a ‘delay in diagnosis [could] adversely affect a person’s condition,’ not that it did so in this case.
 

 “... Dr. Jones’s opinion does not constitute substantial evidence that the two- or three-hour delay of which Mrs. Duck-worth complains probably adversely affected Mr. Duckworth’s response to treatment.
 

 “The expert testimony presented in the cases cited by Mrs. Duckworth is clearly distinguishable.
 
 Travis v. Scott,
 
 667 So.2d 674, 678 (Ala.1995) (plaintiff’s expert testified that if surgery had been performed on the decedent two days after she was admitted to the hospital, rather than eight days,after admission, she ‘probably would have survived’);
 
 University of Alabama Health Servs. Found., P.C. v. Bush,
 
 638 So.2d 794, 803 (Ala.1994) (plaintiffs expert testified that the challenged delay in treating the plaintiffs meningitis infection ‘causfed]’ or ‘contributed to the neurological damage that occurred’);
 
 Parker v. Collins,
 
 605 So.2d [824] at 826 [(Ala.1992)] (breast-cancer patient’s experts were ‘80% certain’ that cancer invaded the lymph nodes, necessitating a ‘mastectomy and [a] course of chemotherapy and radiation treatments,’ because of the defendant-doctor’s failure timely to diagnose a lump in the plaintiffs breast).”
 

 883 So.2d at 1220-21 (emphasis omitted).
 

 More recently, in
 
 Crutcher v. Williams,
 
 12 So.3d 631 (Ala.2008), this Court reversed a judgment entered on a jury verdict for a plaintiff in a medical-malpractice case. The plaintiff, Iola Williams, sued an emergency-room physician, alleging that his failure to treat her dangerous brain condition or to arrange for her to transfer to another medical facility by emergency vehicle caused a delay in treatment and a lack of emergency care when it was needed. In our analysis, this Court set out the relevant and longstanding standard of care in medical-malpractice cases based on a delay in treatment:
 

 “This is a medical-malpractice action governed by the Alabama Medical Liability Act, § 6-5-480
 
 et seq.
 
 and § 6-5-541
 
 et seq.,
 
 Ala.Code 1975 (‘the AMLA’).
 
 See Mock v. Allen,
 
 783 So.2d 828, 832 (Ala.2000) (‘The AMLA applies “[i]n any action for injury or damages or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care.” ’ (quoting § 6-5-548(a), Ala.Code 1975)). ‘To prevail on a medical-malpractice claim, a plaintiff must prove “ T) the appropriate standard of care, 2) the doctor’s deviation from that standard, and 3) a proximate causal connection between the doctor’s act or omission constituting the breach and the injury sustained by the plaintiff.’ ” ’
 
 Giles v. Brookwood Health Servs., Inc.,
 
 5 So.3d 533, 549 (Ala.2008) (quoting
 
 Pruitt v. Zeiger,
 
 590 So.2d 236, 238 (Ala.1991), quoting in turn
 
 Bradford v. McGee,
 
 534 So.2d 1076, 1079 (Ala. 1988)). Although a delay in medical treatment may, in an appropriate case, constitute a breach of the standard of care as a matter of law, it does not, in and of itself, constitute an injury.
 
 See
 

 
 *821
 

 McAfee ex rel. McAfee v. Family Med., P.C.,
 
 641 So.2d 265 (Ala.1994)(holding that, absent proof of actual injury caused by alleged delay in the diagnosis and treatment of disease, plaintiffs could not recover on their AMLA claims against medical-service providers). Rather, to prevail on a medical-malpractice claim based on a delay in providing medical treatment, the plaintiff must prove that a breach of the standard of care,
 
 ie.,
 
 the delay in treatment,
 
 proximately
 
 and
 
 probably
 
 caused actual injury to the plaintiff. See
 
 McAfee,
 
 641 So.2d at 267 (‘In medical malpractice cases, the plaintiff must prove that the alleged negligence “probably caused the injury.”
 
 Parrish v. Russell,
 
 569 So.2d 328, 330 (Ala.1990), citing
 
 Williams v. Bhoopathi,
 
 474 So.2d 690, 691 (Ala.1985). This has been the standard in Alabama for decades.’).
 

 “Our careful examination of the record reveals no evidence indicating that, once Williams arrived at UAB hospital, Williams’s treatment, or the outcome of her treatment, was in any way affected by any action Dr. Crutcher took or failed to take. Conjecture by an expert witness that Williams might have received treatment for her hydrocephalus sooner had Dr. Crutcher treated Williams for that condition at Hill Hospital and arranged for her transport to UAB hospital is not sufficient to establish that she
 
 probably
 
 would have received treatment for hydrocephalus sooner. It is undisputed that Williams would not have been relieved of her pain before the ventricular shunt was installed. Dr. Hadley’s testimony that he would have or might have
 
 admitted Williams to the hospital
 
 for monitoring early on Saturday, June 27, 1998, if he had seen a copy of the MRI report at that time, does not, without more, indicate a probability that Dr. Hadley would have
 
 performed the surgery
 
 to install the ventricular shunt any earlier than Tuesday, June 30.
 
 See McAfee,
 
 641 So.2d at 267 (‘ “The proof must go further than merely show that an injury could have occurred in an alleged way — it must warrant the reasonable inference and conclusion that it did so occur as alleged ....”’ (quoting
 
 McKinnon v. Polk,
 
 219 Ala. 167, 168, 121 So. 539, 540 (1929))). Because the record does not contain substantial evidence indicating that Dr. Crutcher proximately and probably injured Williams by causing a delay in her medical treatment upon her arrival at UAB hospital, we conclude that the evidence was not sufficient to warrant a jury determination on Williams’s claim for damages resulting from delayed treatment at UAB hospital.”
 

 12 So.3d at 647-49.
 

 Our cases addressing a delay in diagnosis and/or treatment provide that with regard to the issue of causation, the question is whether the breach of the standard of care, i.e., the delay in diagnosis and/or treatment, proximately and probably caused actual injury to the plaintiff. To resolve the issue of causation, we must determine whether the plaintiff presented evidence indicating that the delay proximately and probably caused the plaintiff an actual injury.
 

 When the evidence is reviewed in a light most favorable to Julie, as the nonmovant, and all reasonable inferences from the evidence drawn in her favor, as we are required to do when reviewing a summary judgment, the evidence presented indicates that premature infants are at risk for ROP, which affects the blood vessels on the retina in a premature infant’s eyes. ROP is diagnosed during an eye examination, and premature infants should have their eyes examined at regular intervals until the infant has reached full vasculari-
 
 *822
 
 zation or until the risk of developing ROP has passed. A delay in the frequency of examinations of the infant’s eyes can allow ROP to develop and to progress to such a stage as to render treatment ineffective and result in blindness.
 

 Dr. Saunders testified that generally a pediatric ophthalmologist is responsible for scheduling and performing necessary ROP follow-up examinations. He stated that Dr. Rich was responsible for the follow-up examination and treatment of Anna’s eyes if he was the only person who could assess the severity of ROP (if it was present), make recommendations for its treatment, determine the intervals of Anna’s eye examinations, and, assuming an ongoing physician-patient relationship, continue to render follow-up examinations and treatment until Anna reached full vascularization or until the risk of retinal detachment had passed. Dr. Saunders testified that all of those factors applied to Dr. Rich as the pediatric ophthalmologist treating infants in the NICU.
 
 [4]
 

 Dr. Saunders testified that Anna’s failure to appear on the list in the eye-exam book as a patient scheduled for an ROP reexamination on June 30, 2003, should have triggered some sort of investigation by Dr. Rich as to why Anna was not in the book. Dr. Rich testified that he was expecting to see Anna on June 30, 2003, for her follow-up examination. Dr. Saunders went on to opine that recurrent ROP eye examinations more likely than not would have prevented Anna from going blind and that ultimately the failure to examine Anna’s eyes was the cause of her blindness because an examination would have prompted treatment, which, more likely than not, would have resulted in an 80% chance of salvaged vision. Dr. Saunders testified that Dr. Rich deviated from the applicable standard of care by writing in the eye-exam book that Anna’s eyes did not need further examination.
 

 With regard to ROP eye examinations in the NICU, it is undisputed that Dr. Rich was the only person to write in the eye-exam book as to whether follow-up examinations were needed and that he wrote down the incorrect information in the eye-exam book regarding Anna’s need for a follow-up ROP examination. Transposing the information incorrectly was an act of negligence in and of itself.
 
 [5]
 
 Nevertheless, Dr. Rich essentially argues that it was not his error in transposing the information from the eye form to the eye-exam book that caused the delay in Anna’s treatment but the error of the NICU in using the eye-exam book instead of the eye form to determine whether an infant needed to be
 
 *823
 
 reexamined for ROP. However, Julie has presented substantial evidence of the existence of a genuine issue of material fact as to whether the eye-exam book was the proper source for scheduling ROP examinations. Dr. Eyal testified that the NICU has used the eye-exam book as the source for scheduling ROP examination for at least 15 years because the eye form is not always available. The eye-exam book stays in the NICU and cannot be misplaced, whereas the eye forms do not immediately appear in a patient’s chart and charts are “thinned out” on a regular basis, possibly removing the eye form from the patient’s chart and placing the culled reports in a different place in the NICU. Dr. Eyal testified that Dr. Rich is the only person to write in the eye-exam book, which prevented a ward clerk from possibly misinterpreting Dr. Rich’s handwriting on the eye form and transposing incorrect data into the eye-exam book.
 

 We recognize that Dr. Rich testified that the NICU had violated its own written policy by not having the ward clerk responsible for using the eye form to write in the eye-exam book who needed a follow-up ROP examination and to then schedule the necessaiy exams with his office. Dr. Saunders testified that Dr. Rich appears to have modified the protocol himself by writing the results of his eye exams in the eye-exam book as noted on the eye form. Dr. Saunders also testified that generally the eye-exam book was more reliable than the eye form so a deviation from the NICU’s written protocol would have been appropriate. Dr. Saunders testified that the information in the eye-exam book was a directive on care of the child and it was part of the medical records for multiple children. Dr. Saunders testified that, if Dr. Rich believed that the protocol and procedure for ROP examinations at the NICU was deficient, he had a responsibility to advise USA of that belief. Additionally, Dr. Saunders testified that Dr. Rich’s completion of Anna’s eye forms was deficient. Moreover, there is a reasonable inference that Dr. Rich knew that the eye-exam book was used to schedule follow-up eye examinations because he was the only person writing such information in the eye-exam book. Dr. Rich characterized the eye-exam book as a “spent” page used to make sure he did not miss any patients during his visit. However, he placed information regarding follow-up visits in the eye-exam book.
 

 Dr. Rich and Vision Partners argue that because there were two sources for identifying whether an infant needed a follow-up ROP examination (the eye form and the eye-exam book), then there should have been testimony to the effect that Dr. Rich knew or should have known that one of these “safeguards” would fail. In support of his argument, Dr. Rich cites a special writing in
 
 Thompson v. Patton,
 
 6 So.3d 1129 (Ala.2008), involving the death of a psychiatric patient. This Court had previously addressed the issue of proximate cause in
 
 Patton v. Thompson,
 
 958 So.2d 308 (Ala.2006). A psychiatrist’s patient had been treated for psychiatric illness for approximately 30 years when she was admitted to a hospital after she had attempted suicide. She had been admitted three times in the previous year following suicide attempts, and the psychiatrist had been her physician during those hospital admissions. The patient was placed on a suicide watch during her stay. She was discharged after 11 days, although the day before her discharge she stated that she hoped she would not hurt herself and that she was scared and worried, showing signs of paranoia. The psychiatrist had implemented a discharge plan for the patient that included: (1) a follow-up appointment with her therapist from the mental-health center; (2) arrangements for daily visits by a home-
 
 *824
 
 health psychiatric nurse; and (3) help from a relative in monitoring her medication compliance. The patient kept her appointment at the mental-health center, but the therapist noted that the patient had been unable to fill her prescription for a drug used to treat schizophrenia, that she was obsessed with psychotic thoughts, that she was frightened, and that she had an “inappropriate and blunted affect.” 958 So.2d at 305. The patient was found dead in her apartment two days later. The patient’s family sued the psychiatrist under the AMLA, alleging that the psychiatrist breached the standard of care by prematurely discharging the patient from the hospital, by failing to formulate an appropriate outpatient-treatment plan, by failing to readmit her to a psychiatric unit, and by failing to implement proper suicide precautions. The trial court denied the psychiatrist’s summary-judgment motion, concluding that evidence regarding the foreseeability of the patient’s suicide was sufficient to create a genuine issue of material fact as to whether the psychiatrist’s alleged negligence caused the patient’s death. On appeal, this Court stated that “a medical-malpractice action based on a patient’s suicide is different from a general medical-malpractice action,” 958 So.2d at 312, because the foreseeability of the plaintiffs suicide is an essential element of proof in a medical-malpractice action arising out of a suicide. The question whether the psychiatrist knew or should have known that the patient might harm herself must be addressed to determine whether a duty to prevent her suicide existed. The psychiatrist knew that the patient had suicidal tendencies and that she had manifested suicidal proclivities during her most recent hospital stay; therefore, the psychiatrist had a duty to take reasonable precautions to prevent the patient’s suicide. However, evidence of foreseeability was not sufficient to show that the breach of the psychiatrist’s duty caused the patient’s suicide. The patient’s family needed to present substantial evidence of the applicable standard of care, that the psychiatrist breached that standard of care, and that the breach was a proximate cause of the patient’s suicide. This Court remanded the case for the trial court to determine whether the patient’s family had established those elements as well.
 

 On the second appeal, this Court concluded that the patient’s family failed to present substantial evidence of proximate cause.
 
 Thompson v. Patton,
 
 6 So.3d 1129 (Ala.2008). The patient’s family presented substantial evidence that when the patient was discharged from the hospital, it was reasonably foreseeable to the psychiatrist that there was a probability that the patient would attempt suicide or self harm, and that evidence, along with the expert’s testimony that the psychiatrist breached the standard of care, created a question of fact as to whether the psychiatrist breached the standard of care. However, that evidence showed only that there was an unquantitative probability that the patient might possibly attempt suicide or self harm, and evidence showing only a probability of a possibility is insufficient to establish proximate causation in a negligence action alleging medical malpractice. The foreseeability evidence went to the question of the psychiatrist’s duty to the patient and was not enough by itself to establish that the psychiatrist’s breach caused the patient to commit suicide.
 

 The present case did not involve a suicide. The duty of health-care providers, when a patient may attempt to harm himself, contemplates the reasonably foreseeable occurrence of self harm, and such self-destructive conduct involves the necessity of precautions or safeguards to attempt to prevent such harm. Here, Julie was not required to prove that Dr. Rich knew or should have known that it was
 
 *825
 
 foreseeable that the “safeguard” of having both an eye form and an eye-exam book in the NICU would fail.
 

 Dr. Rich and Vision Partners argue that because Dr. Saunders identified other causes for the delay in Anna’s examination, Julie failed to present evidence indicating that the actions or inactions of Dr. Rich proximately caused Anna’s injury. Dr. Rich identifies portions of Dr. Saunders’s testimony regarding the negligence of Dr. Eyal and USA.
 
 [6]
 
 However, any negligence by NICU staff or Dr. Eyal does not abrogate Dr. Rich and Vision Partners of liability for Dr. Rich’s alleged breach of the standard of care. “[W]here separate causes act contemporaneously to produce a given result, the causes of injury are concurrent within the rule making separate wrongdoers equally liable for the resultant injury.”
 
 Davison v. Mobile Infirmary,
 
 456 So.2d 14, 26 (Ala.1984). In
 
 Looney v. Davis,
 
 721 So.2d 152 (Ala.1998), the plaintiff alleged that negligent health care by all three defendants combined and concurred to cause the death of the patient. This Court stated:
 

 “[W]e note that a particular defendant’s negligence need not be the sole cause of injury in order for an action to lie against that defendant; it is sufficient that the negligence concurred with other causes to produce injury.
 
 Buchanan v. Merger Enterprises, Inc.,
 
 463 So.2d 121 (Ala.1984). However, it is still necessary that the plaintiff prove that the defendant’s negligence proximately caused the injury.
 
 Martin v. Arnold,
 
 643 So.2d 564 (Ala.1994).”
 

 721 So.2d at 158.
 

 Dr. Rich and Vision Partners argue that if the doctrine of combined and concurring negligence is applicable, Julie’s reliance on
 
 Davison v. Mobile Infirmary,
 
 supra, is misplaced because that case was decided under the “scintilla rule,” and the 1996 amendments to the AMLA abandoned the scintilla rule in favor of substantial evidence. They argue that combined and concurring negligence has since fallen into desuetude in medical-malpractice cases. However, in
 
 Marsh v. Green,
 
 782 So.2d 223 (Ala.2000), this Court held that the trial court erred in failing to give a jury instruction on combined and concurring negligence. This Court references
 
 Davi-son
 
 in
 
 Marsh
 
 for the proposition that combined and concurring negligence can cause a single injury. In
 
 Marsh,
 
 the plaintiff sued her physician, alleging that he committed medical malpractice by failing to remove a cancerous mass from her breast. The plaintiffs physician, Dr. Green, asserted the negligence of another doctor involved in treating the plaintiff. This Court stated:
 

 “Marsh argues that the trial court erred in refusing to charge the jury on the law of combining and concurring negligence. Under the law of combining and concurring negligence, Dr. Green can be liable for his own negligence, notwithstanding the fact that others, who are not his agents, could be liable for their own negligence. See
 
 Davison v. Mobile Infirmary,
 
 456 So.2d 14, 25 (Ala.1984). Marsh contends that she was entitled to instructions on combining and concurring negligence because Dr. Green had blamed Dr. Wenzel for Dr. Green’s failure to diagnose the cancer. At trial, after Dr. Green said he was not ‘blaming Dr. Wenzel of anything,’ Marsh specifically asked Dr. Green, ‘But you’re saying it’s his fault that you didn’t take the mass out; aren’t you?’ No objection was interposed on the ground that Dr. Green was not qual
 
 *826
 
 ified to answer a question concerning the standard of care owed by a pathologist. Dr. Green answered, ‘There was an error in his path report, yes.’ During closing argument, Dr. Green stated, T understand that Dr. Wenzel comes in here with some baggage. I understand about the mistake he made. I know that. I understand that....’ By characterizing the conduct of Dr. Wenzel, Marsh contends that Dr. Green placed the question of combining and concurring negligence at issue.
 

 “The [Medical Liability Act] specifies the plaintiffs burden of proof in a medical-malpractice action. Section 6-5-548(a), Ala.Code 1975, reads:
 

 “ ‘In any action for injury or damages or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care, the plaintiff shall have the burden of proving by substantial evidence that the health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice ordinarily have and exercise in a like case.’
 

 “If a physician injects the fault of another health-care provider not similarly situated to him, can that physician avoid making combining and concurring negligence an issue by pointing to the requirements of § 6-5-548(a), requiring proof of the breach of the standard of care by evidence from a similarly situated health-care provider, and attacking the evidence as lacking in this respect? We answer this question in the negative.
 

 “The [Medical Liability Act] was enacted to protect the public from increased costs. § 6-5-540. The [Medical Liability Act] does so by imposing strict standards on actions against health-care providers. Clearly, it functions as a shield. To permit a healthcare-provider defendant to inject the alleged fault of another health-care provider from a different specialty and then avoid any instruction on combining and concurring negligence by insisting upon the proof requirement of § 6-5-548(a) would allow the defendant to use the statute as a sword, not a shield. We analogize this circumstance to ‘opening the door,’ the situation where allowing or offering inadmissible evidence makes matters relevant that otherwise the fact-finder would not be able to consider. See Charles W. Gamble,
 
 McElroy’s Alabama Evidence,
 
 § 14.01 (5th ed.1996).
 

 “Because he presented evidence characterizing Dr. Wenzel as at fault and injected an argument about Dr. Wen-zel’s alleged mistake, notwithstanding other testimony in which he disclaimed any attempt to blame Dr. Wenzel, Dr. Green should be estopped to insist on strict application of the § 6-5-548(a) standard of proof as to Dr. Wenzel’s conduct. Dr. Green also argues that the requested instruction was defective because it was not cast in terminology consistent with the concept of medical malpractice as described in the [Medical Liability Act], as opposed to concepts of traditional negligence. Having used terms such as ‘fault’ and ‘mistake’ to describe Dr. Wenzel’s conduct, however, Dr. Green cannot now insist on the more sophisticated terminology used in the [Medical Liability Act].
 

 “If the trial court had charged the jury on combining and concurring negligence, then the jury would have been better equipped to deal with the ignorance of Dr. Green that was caused by Dr. Wenzel’s negligence when combining with evidence of negligence on the part of Dr. Green. As previously noted, Marsh also argues that the verdict is against the great weight of the evidence
 
 *827
 
 because, she argues, Dr. Green admitted that he gave medical advice that caused her cancer to spread. While we have declined to reverse the judgment for the trial court’s failure to grant a new trial as to this issue, we refer to Marsh’s contention at this juncture to illustrate the existence of substantial evidence in support of Marsh’s claims against Dr. Green. By failing to permit Marsh to argue and to have a jury instruction on combining and concurring negligence, the trial court allowed the jury to give inappropriate weight to Dr. Green’s defense based upon his ignorance of the existence of cancer. Because the trial court erred in refusing to give the jury an instruction on combining and concurring negligence, when such a charge was appropriate, based on the testimony and argument of Dr. Green, we must reverse and remand for a new trial.”
 

 782 So.2d at 227-29. The adoption of the substantial-evidence rule in the 1996 Amendments to the AMLA changed an evidentiary standard. Combined and concurring negligence, in contrast, is a doctrine of law applied to concurrent tortfea-sors. Additionally, simply because this Court has not addressed combined and concurring negligence in a medical-malpractice case since it decided
 
 Marsh
 
 in 2000 does not mean that the doctrine is no longer viable.
 

 Conclusion
 

 In conclusion, the trial court was charged with viewing Julie’s evidence in a light most favorable to her as the non-moving party, as well as drawing all reasonable inferences from such evidence in her favor. Julie presented testimony by a qualified expert with a proper evidentia-ry foundation that Dr. Rich did not meet the standard of care in Anna’s treatment in several respects, including writing incorrect information in the eye-exam book regarding Anna’s need for follow-up treatment. She also presented substantial evidence indicating that if Dr. Rich had not acted negligently, Anna probably would have had a better outcome. In fact, Dr. Saunders testified that had Anna been timely examined and the resultant proper treatment administered, she would have had an 80% chance of salvaged vision. Although persons other than Dr. Rich may also have acted negligently, then-negligence cannot absolve Dr. Rich and Vision Partners of liability for Dr. Rich’s own breach of the standard of care. Accordingly, the summary judgment of the trial court is reversed and the cause is remanded for proceedings consistent with this opinion.
 

 REVERSED AND REMANDED.
 

 COBB, C.J., and WOODALL, MURDOCK, and MAIN, JJ., concur.
 

 [1]
 

 . Section 6-5-482(a), Ala.Code 1975, of the AMLA provides, in pertinent part:
 

 "(a) All actions against physicians, surgeons, dentists, medical institutions, or other health care providers for liability, error, mistake, or failure to cure, whether based on contract or tort, must be commenced within two years next after the act, or omission, or failure giving rise to the claim, and not afterwards; provided, that if the cause of action is not discovered and could not reasonably have been discovered within such period, then the action may be commenced within six months from the date of such discovery or the date of discovery of facts which would reasonably lead to such discovery, whichever is earlier; provided further, that in no event may the action be commenced more than four years after such act....”
 

 The issue of the statute of limitations has not been raised or addressed on appeal.
 

 [2]
 

 . Dr. Rich also challenged the amount of time Dr. Saunders spent reviewing the documentary evidence before him upon which he based his expert opinion, and Dr. Rich challenged Dr. Saunders's understanding of proximate cause as defined by Alabama law. Those challenges would go toward the weight of Dr. Saunders's testimony if the case went to trial before a jury. See Charles W. Gamble and Robert J. Goodwin,
 
 McElroy's Alabama Evidence
 
 § 127.02(8)(6th ed.2009) ("An expert opinion, or expert testimony in some other form, is admitted to assist the trier of fact. What weight, if any, is given such testimony is for the trier of fact.” (footnotes omitted)). See also Ala. R. Evid., Rule 104(e), Advisory Committee's Notes ("Evidence of facts sufficient to qualify a witness as an expert in no way precludes the jury from deciding what weight, if any, to give that witness’s testimony.”).
 

 [3]
 

 . Rule 50(a), Ala. R. Civ. P., effective October 1, 1995, renamed a “motion for a directed verdict” a "motion for a judgment as a matter of law.”
 

 [4]
 

 . Dr. Rich began consulting as a pediatric ophthalmologist with the NICU in 2001. Before that time, Dr. Rich was a professor of ophthalmology at USA’s medical school.
 

 [5]
 

 . In
 
 Mobile Infirmary Association v. Tyler,
 
 981 So.2d 1077 (Ala.2007), a medical-malpractice and wrongful-death action arising out of death of a hospital patient from intestinal infection, evidence supported a finding that the hospital nurse negligently failed to adequately and accurately communicate the nature and severity of patient’s abdominal pain. The patient's son testified that the patient was screaming in pain and that the nurse was present with the patient when the son entered the patient’s room, and other relatives corroborated his testimony. The nurse’s notes of her treatment of the patient stated that the patient reported experiencing the worst abdominal pain she had ever had. The nurse did not communicate that the patient was experiencing serious abdominal pain, and a similarly situated health-care provider testified that the nurse's action in failing to communicate that the patient described her pain as the worst she had ever experienced fell below the applicable standard of care. "There was sufficient evidence to show that an accurate communication [from the nurse to the triage nurse] would have ultimately resulted in a surgeon performing an embolec-tomy, which [the patient] probably would have survived.” 981 So.2d at 1101.
 

 [6]
 

 . Those causes included the NICU’s removal of Dr. Rich's eye form from Anna’s chart; the failure of the ward clerk to review the eye form; and the failure of the head nurse to properly supervise the ward clerk.