The plaintiffs in this medical malpractice lawsuit, Chrissy Tagert Bradley ("Chrissy") and Michael Bradley ("Michael"), appeal a summary judgment for the defendant Rebecca Miller, M.D. ("Dr. Miller"). The dispositive issue is whether the plaintiffs, in responding to Dr. Miller's summary-judgment motion, met their burden of producing substantial evidence, in the form of medical expert testimony, of proximate cause. Because the opinion of the plaintiffs' medical expert regarding proximate cause lacked an evidentiary foundation, it failed to meet the plaintiffs' burden of production. Therefore, we affirm the summary judgment for Dr. Miller.
While pregnant, Chrissy suffered preeclampsia, a pregnancy disorder, which killed the fetus on May 23, 1999. To recover for the death of the fetus, the plaintiffs sued Dr. Miller, Chrissy's obstetrician. The plaintiffs contended that Dr. Miller, a third-year-resident physician in obstetrics and gynecology ("OB/GYN") at the University of South Alabama ("USA"), breached the standard of care by: (1) failing to classify Chrissy's pregnancy as a high-risk pregnancy; (2) failing to ensure that the administrative staff of the USA Center Street OB/GYN Clinic ("the Clinic"), where Dr. Miller treated Chrissy, did not cancel Chrissy's May 6, 1999, appointment with Dr. Miller; (3) failing to "seek out" the results of an ultrasound performed on April 28, 1999, showing that the fetus was experiencing growth retardation; and (4) failing to diagnose that the onset of Chrissy's preeclampsia was impending.
In moving for summary judgment, Dr. Miller contended that the plaintiffs could not produce the expert medical testimony regarding proximate cause required of plaintiffs to withstand summary judgment in a medical malpractice case because the evidentiary foundation for such expert medical testimony did not exist. Dr. Miller contended that the evidentiary foundation did not exist because: (1) the evidence established only that Chrissy did not suffer from preeclampsia when Dr. Miller saw her for the last time on April 15, 1999 and that Chrissy was suffering from preeclampsia when she was next seen by a physician on May 23, the day the child died, and (2) no evidence established when the onset of Chrissy's preeclampsia began or whether the onset was gradual or sudden. Dr. Miller contended that this state of the evidence foreclosed any expert medical opinion except mere speculation that *Page 264 
the fetus probably would have been saved in the absence of the alleged breaches of the standard of care by Dr. Miller.
 Facts
The onset of preeclampsia can be either gradual or sudden. The symptoms of preeclampsia include high blood pressure (blood pressure exceeding 140/90), excessive protein in the urine (proteineuria), and swelling or edema. Symptoms of severe preeclampsia can include headaches and blurred vision.
Dr. Miller saw Chrissy, then 20 years old, at the Clinic for the first time on December 17, 1998. Chrissy's mother had suffered two placental abruptions and several strokes. Chrissy's father had suffered from heart disease and high blood pressure. Michael, the father of the fetus, had been born premature with a heart defect. Chrissy told Dr. Miller that she smoked cigarettes, although she had reduced her smoking to one-half pack of cigarettes per day after she learned that she was pregnant. Dr. Miller warned Chrissy that smoking posed a danger to both Chrissy and her child and advised Chrissy to stop smoking altogether. Despite the medical history of Chrissy's parents, Michael's premature birth and heart defect, and Chrissy's smoking habit, Dr. Miller initially assessed Chrissy's risk of complications as low because Chrissy herself had no past or present health problems despite her smoking.
Thereafter, Dr. Miller saw Chrissy for follow-up visits on January 20, February 19, March 23, and April 15, 1999. Chrissy did not exhibit or report any symptoms of preeclampsia during any of her visits to Dr. Miller. Although Chrissy's blood pressure readings gradually increased over the course of her visits to Dr. Miller from 106/70 to 134/70, none of her readings exceeded normal blood pressure. The urinalysis performed on each visit showed that Chrissy's urine was free of protein. Chrissy exhibited no edema and reported no headaches or blurred vision.
Because a routine triple-screen blood test in February had shown that Chrissy had higher-than-normal levels of alpha fetal protein ("AFP"), an inconclusive indicator of possible birth defects, Dr. Miller referred Chrissy to the USA Genetics Department to rule out the possibility of birth defects. The USA Genetics Department sent Chrissy to Dr. Lynn Groome, an attending physician in the USA OB/GYN Department, for an ultrasound and amniocentesis. Dr. Groome performed the ultrasound and withdrew the amniotic fluid for analysis on April 28. In a letter of that date to Dr. Miller, Dr. Groome reported that the ultrasound did not show any identifiable structural abnormalities and that the results of the analysis of the amniotic fluid would be available in two weeks. Dr. Groome reported also that, on the basis of the estimated length of the pregnancy, he estimated the child's weight to be below the third percentile.
While the plaintiffs' medical expert opined that fetal weight below the third percentile was a sign of retardation of a fetus's development, he did not opine that either a relatively low fetal weight or retardation of a fetus's development were signs of preeclampsia. The pathologist who performed the autopsy on Chrissy's fetus after it died on May 23 ultimately determined that the fetus's morphology and external measurements when it died on May 23 were normal for a fetus of the estimated gestational age of Chrissy's fetus on that date. The pathologist did not attribute the death of the fetus to low fetal weight or developmental retardation.
The Clinic staff placed Dr. Groome's April 28 letter in Chrissy's chart without first bringing it to Dr. Miller's attention. Dr. Miller did not see Dr. Groome's April *Page 265 
28 letter until after the death of the fetus on May 23. While Dr. Miller also did not see the results of the May 3 analysis of the amniotic fluid before the death of the fetus, that analysis determined that the AFP of the amniotic fluid was normal.
At the end of the April 15 visit, Dr. Miller had instructed Chrissy to return for her next visit on May 6, and the Clinic administrative staff scheduled Chrissy for an appointment on May 6. However, Chrissy testified that, about a week before May 6, she received a letter cancelling the May 6 appointment and rescheduling it for May 27. Dr. Miller testified that she did not personally cancel the May 6 appointment, that she did not know that anyone else had cancelled the May 6 appointment, and that she saw patients at the Clinic on May 6. However, the plaintiffs presented substantial evidence from which a fact-finder could infer that Dr. Miller could have discovered the cancellation and reinstated the May 6 appointment. Dr. Miller agreed with the plaintiffs' medical expert that the standard of care obliged Chrissy's obstetrician to see Chrissy on May 6.
About May 22, Chrissy began to experience cramping in her stomach and abdomen. She experienced also a brown vaginal discharge. Chrissy felt the fetus move for the last time about 10:00 a.m. on May 23. Later, she experienced a headache and blurred vision. About 10:00 p.m. on May 23, Chrissy went to the USA Children's and Women's Hospital where her initial blood pressure reading was 176/93 and her second reading was 185/101. The hospital physician diagnosed preeclampsia on the basis of Chrissy's blood pressure readings. Chrissy did not have protein in her urine. An ultrasound revealed that the fetus was dead. The hospital physician induced labor and delivered the dead fetus. The pathologist who performed the autopsy on the fetus attributed the death of the fetus to a lack of uteroplacental blood flow caused by preeclampsia.
Because Chrissy did not see Dr. Miller on May 6 and did not seek medical treatment until the night of May 23, there was no evidence to establish when the onset of Chrissy's preeclampsia began, whether the onset was gradual or sudden, when Chrissy first manifested blood pressure in excess of 140/90, when the adverse effect of the preeclampsia on the child became irremediable, or how much time elapsed between the point in time when a discernible indication of the onset of the preeclampsia first appeared and the point in time when the adverse effect of the preeclampsia on the child became irremediable.
Although the expert employed by the plaintiffs testified that "Dr. Miller should have been aware that rising blood pressure in the absence of proteineuria can be a warning sign of impending preeclampsia, since protein in the urine is not a mandatory component of the diagnosis," he did not testify that Dr. Miller should have diagnosed Chrissy as suffering from preeclampsia on the basis of the rising blood pressure readings she had exhibited between January 20 and April 15. Rather, he opined that Dr. Miller was negligent in failing to classify Chrissy's pregnancy as high risk and failing to see Chrissy on May 6:
 "Almost any clinician would agree that smoking constitutes high-risk behavior, especially during pregnancy. When faced with a personal history of smoking, a family history of multiple strokes and placental abruption in the mother and high blood pressure and heart disease in the father, and a history of the father of the baby having been born prematurely with a heart defect, it is at least surprising that Dr. Miller classified the patient as `low risk' and without health problems. But when these factors are compounded by elevated *Page 266 
alpha-fetoprotein and steadily rising blood pressures, it is negligence not to have labeled Ms. Tagert Bradley as high-risk, meritorious of enhanced maternal and fetal surveillance."
(C. 244)
 "At the least she should have been seen on 5/6, the date of regular next visit. At this visit her blood pressure could have been rechecked, the fetal retardation could have been addressed, and fetal surveillance begun or hospital admission considered. It was below the standard of acceptable medical care to wait until 5/27, six weeks after her prior visit, to see this high-risk patient again."
(C. 240.) The expert opined also that "[i]t was below the standard of care to not act timely upon Dr. Groome's warning of fetal growth retardation." (C. 244.) Finally, the expert opined that the risk of fetal growth retardation warranted closer surveillance of the fetus and that the closer surveillance "would have indicated increasing fetal jeopardy and would have resulted in early delivery of a live infant." (C. 241) The expert did not testify that closer surveillance would have indicated increasing jeopardy from preeclampsia specifically.
 Law and Analysis
"We review a summary judgment de novo." Potter v. First Real EstateCo., 844 So.2d 540, 545 (Ala. 2002).
 "To prove liability in a medical malpractice case, the plaintiff must prove (1) the appropriate standard of care, (2) the doctor's deviation from that standard, and (3) a proximate causal connection between the doctor's act or omission constituting the breach and the injury sustained by the plaintiff."
Looney v. Davis, 721 So.2d 152, 157 (Ala. 1998).
 "To prove causation in a medical malpractice case, the plaintiff must prove, through expert medical testimony, that the alleged negligence probably caused, rather than only possibly caused, the plaintiff's injury."
University of Alabama Health Servs. v. Bush, 638 So.2d 794, 802 (Ala. 1994). "[T]he opinions of an expert may not rest on `mere speculation and conjecture.' Townsend v. General Motors Corp., 642 So.2d 411, 423 (Ala. 1994)." Dixon v. Board of Water Sewer Comm'rs of Mobile, [Ms. 1012131, March 14, 2003] 865 So.2d 1161, 1166 (Ala. 2003). "[A]s a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference. See, e.g., Griffin Lumber Co. v. Harper, 247 Ala. 616,25 So.2d 505 (1946)." Alabama Power Co. v. Robinson, 447 So.2d 148,153-54 (Ala. 1983). An expert witness's opinion that is conclusory, speculative, and without a proper evidentiary foundation cannot create a genuine issue of material fact. Becton v. Rhone-Poulenc, Inc.,706 So.2d 1134, 1141-42 (Ala. 1997).
In essence, the plaintiffs' expert opined that, if Dr. Miller had monitored Chrissy more closely for pregnancy complications other than preeclampsia, Dr. Miller would have incidentally detected the onset of Chrissy's preeclampsia in time to effect an early delivery of the fetus before the preeclampsia killed the fetus. However, the necessary evidentiary foundation for such an opinion did not exist. The undisputed evidence affirmatively established that Chrissy did not suffer from preeclampsia as of April 15, the last time Dr. Miller saw Chrissy. Moreover, there was no evidence to establish that Chrissy suffered from preeclampsia before the hospital checked her blood pressure on the night of May 23 and found it above 140/90. The plaintiffs did not even present any evidence that Chrissy's cramps and vaginal discharge established that she suffered from preeclampsia on May 22. Given this state of the evidence, the plaintiffs' expert could only speculate about the timing and *Page 267 
manner of the onset of Chrissy's preeclampsia and, in turn, the rapidity of the adverse effects of the preeclampsia on the fetus. This speculation, in turn, was the only available foundation for the conclusory opinion of the plaintiffs' expert that the fetus could have been saved if Dr. Miller had monitored Chrissy more closely, for instance, by seeing Chrissy on May 6, the date of the cancelled appointment. Because the foundation for the expert's conclusory opinion consisted entirely of speculation, the conclusory opinion itself could be only speculation. Because the conclusory opinion of the plaintiffs' expert that the child could have been saved with closer monitoring was only speculation, it did not constitute substantial evidence of proximate causation. SeeUniversity of Alabama Health Servs., supra; Townsend, supra; Dixon,supra; Alabama Power Co., supra; and Becton, supra. Accordingly, we affirm the summary judgment for Dr. Miller.
AFFIRMED.
HOUSTON, LYONS, WOODALL, and STUART, JJ., concur.