BOLIN, Justice.
Toma E. Smith, as personal representative of the estate of Tiffani P. Smith, appeals from a summary judgment entered in favor of Dr. James Fleming and from a judgment entered on a jury verdict in favor of Dr. Winfield S. Fisher III and the University of Alabama Health Services Foundation (“the Foundation”) on claims brought pursuant to the Alabama Medical Liability Act, § 6-5-480 et seq. and § 6-5-540 et seq., Ala.Code 1975 (“the AMLA”). Dr. Fisher and the Foundation cross-appeal, asserting, in relevant part, that the action should have been dismissed as being void ab initio.

Facts and Procedural History

Tiffani P. Smith was seen at University of Alabama at Birmingham Hospital (“UAB Hospital”) on October 31, 2007, after complaining of severe headaches for approximately two weeks. A CT scan of Tiffani’s brain revealed the presence of a large unruptured intracranial aneurysm on the ophthalmic artery. Tiffani was placed in the care of Dr. Fisher, a board-certified neurosurgeon in UAB Hospital’s Department of Neurosurgery, who recommended performing surgery to repair the aneurysm. Dr. Fisher had been practicing neurosurgery for approximately 35 years, was a full professor of neurosurgery at UAB Hospital, and was the director of the Neurosurgery Intensive Care Unit (“NICU”) at the hospital. Tiffani was admitted to the hospital the evening of October 31, 2007, and was administered intravenous (“IV”) fluids and medications, including antibiotics, pain medications, and corticosteroids pursuant to Dr. Fisher’s standing template of orders for neurosurgery patients. Dr. Fisher ordered that Tiffani continuously receive maintenance IV fluids at the rate of 125 cc’s per hour during the pendency of her stay in the hospital.
Dr. Fisher performed an open cranioto-my to “clip” the aneurysm on Thursday, November 1, 2007. The surgery to repair the aneurysm was successful; Tiffani experienced no complications during the procedure. Tiffani was taken to the NICU postoperatively for observation and recovery. She was continued on the medications and fluids that had been ordered upon admittance to the hospital.
On Friday, November 2, 2007, Dr. Fisher ordered an additional CT scan and an arteriogram as part of his routine follow *113 up care for neurosurgery patients in order to confirm that Tiffani was recovering from the surgery as expected and experiencing no complications. The CT scan indicated that there was a small amount of residual blood at the surgery site and a little swelling, which was not uncommon after surgery. The tests confirmed that the “clip” was properly placed on the aneurysm. Dr. Fisher determined that Tiffa-ni’s recovery was progressing well and released her from the NICU to a regular room on the “floor.”
Toma E. Smith, Tiffani’s husband, stated that Tiffani began complaining of headaches between approximately 10:00 p.m. and 11:00 p.m. on the evening of Friday, November 2. Toma also testified that on several occasions that evening Tiffani failed to recognize him and asked him who he was.
Dr. James Fleming, a third-year resident physician training in neurosurgery at UAB hospital, was making rounds at approximately 7:00 a.m. on the morning of Saturday, November 3, 2007, when he discovered that Tiffani was in distress. Dr. Fleming testified that, at that time, Tiffani was confused and that, although she was cooperative, she failed to give good effort on the motor-reflex examination he administered, which consisted of asking Tiffani certain questions and to perform certain movements. Tiffani’s most recent lab work taken in the early morning hours of Saturday, November 3, indicated that her sodium level was at 133 milliequivalents per liter (“mEq/L”), which is on the low end of the normal range.[1] Dr. Fleming was informed by the nurse present that the IV line was malfunctioning due to a small leak, which made it impossible to know the amount of IV fluids that Tiffani had received up until that point in time; however, she had not received the amount that she had been prescribed. Dr. Fleming was concerned about Tiffani’s mental status and determined that she needed to be assessed for intracranial pathology. Dr. Fleming ordered a CT scan and that Tiffani be transferred to the NICU. Additionally, Dr. Fleming ordered 500 cc’s of normal saline fluid because of the lower sodium-level reading and the malfunctioning IV line.[2] Those are orders that Dr. Fleming was authorized to make as a third-year resident. Shortly after making these orders, Dr. Fleming contacted Dr. Fisher to inform him of Tiffani’s condition and of his orders.
Toma testified that he lay down on the couch after Dr. Fleming left the room. At approximately 7:30 a.m. he noticed that Tiffani began snoring loudly. Toma called for a nurse, who entered the room and could not get Tiffani to respond to oral commands. Toma noticed a tear running down Tiffani’s cheek and liquid bubbles coming out of her mouth. The nurse sounded an alarm for a “MET” team to respond; Tiffani had gone into respiratory arrest but was resuscitated.[3]
After being resuscitated, Tiffani was taken at approximately 8:45 a.m. for the CT scan that had been ordered by Dr. Fleming. The CT scan showed some re *114 sidual blood at the site of the aneurysm repair and early onset swelling of the brain. After receiving the results of the CT scan and discussing the matter with each other, Dr. Fisher and Dr. Fleming suspected that Tiffani was suffering from vasospasm.[4] Although vasospasm is not common in the case of an unruptured aneurysm, Dr. Fleming testified that the amount of residual blood caused by the aneurysm repair itself was sufficient to trigger vasospasm.
Tiffani was received in the NICU at approximately 9:00 a.m., and her maintenance dose of 125 cc’s of normal saline fluids was continued at that time. Dr. Fleming performed a neurological examination of Tiffani, the results of which indicated that she had no brain activity. Dr. Fleming tested cough reflex, gag reflex, pupillary light reaction, and did a corneal analysis. Dr. Fleming did not detect any functional cranial nerves during the examination. Tiffani’s pupils also remained dilated to 5 millimeters, which is indicative of severe brain-stem injury. Dr. Fisher testified that Tiffani died sometime between 8:45 a.m. and 9:00 a.m., when her brain herniated through the base of her skull.[5] He stated that Tiffani’s treatment was continued because “the catastrophic nature of her death ... mandated that we exclude all possibilities ... and that we gave ourselves and the family ample time to feel comfortable that we had done everything we could.”
Tiffani was started on “HHH” therapy, which is the treatment protocol for vasos-pasm. “HHH” is an acronym for hypertension, hemodilution, and hypervolemia. The treatment protocol for vasospasm calls for increased blood-pressure repressors (hypertension); decreasing the viscosity of the blood, i.e., thinning the blood (hemodi-lution); and keeping the intravascular volume full by giving plenty of IV fluids (hypervolemia). The purpose of the “HHH” therapy is to promote blood flow through constricted vessels. Dr. Fleming testified that Tiffani was started on the “HHH” therapy before he received the results of the CT scan that he had ordered.
Tiffani’s sodium levels had been trending down from a level of 141 mEq/L at 1:00 a.m. on the morning of Friday, November 2, to a level of 133 mEq/L at the time she was first seen by Dr. Fleming. Although the sodium levels had been trending down, they remained within the normal range. However, immediately after being transferred to the NICU, Tiffa-ni’s sodium level had dropped to 128 mEq/L which, according to Dr. Fisher, was a cause for concern. Dr. Fisher ordered hypertonic saline in order to amend the low sodium level, i.e., hyponatremia, and to treat intracranial pressure resulting from brain swelling that had begun.[6] Hy- *115 ponatremia in neurological patients generally results from cerebral salt-wasting syndrome, which is caused by brain injury or brain trauma. A ventriculostomy was placed at approximately 9:45 a.m. in order to measure and to relieve the pressure on Tiffani’s skull. Additionally, Dr. Fisher ordered antibiotics and an anti-epileptic medication for the treatment of possible sepsis and seizure, which Dr. Fisher thought might be a possible cause of Tiffa-ni’s rapidly declining condition, albeit less likely than vasospasm.
Tiffani also began to experience the onset of diabetes insipidus shortly after being transferred to the NICU. Diabetes insipidus is a condition characterized by the output of large volumes of diluted urine. Dr. Fisher stated that diabetes in-sipidus is a terminal event in patients that have had a head injury. The treatment protocol for diabetes insipidus calls for administering vasopressin, an antidiuretic hormone that regulates the body’s retention of water, and large volumes of fluids to replace the fluids lost, i.e., the patient receives a cc input of fluid per cc output of fluid. Dr. Fisher ordered both vasopres-sin and large volumes of fluid for Tiffani.
Tiffani failed to respond to the treatments administered by Dr. Fisher and Dr. Fleming. An EEG was performed on Sunday, November 4, 2007, which confirmed the absence of any brain activity, and Tiffani was pronounced deceased at 2:00 p.m. on that day. An autopsy revealed that Tiffani had experienced hypoxic brain injury leading to severe cerebral edema, which caused the brain to herniate through the foramen magnum, resulting in her death.[7]
Dr. Fisher testified that the postoperative care of a neurosurgery aneurysm patient is very complex, involving fluid- and electrolyte-balance problems, respiratory issues, and neurological issues. He stated that fluid management in patients that have had brain surgery requires close attention to detail regarding sodium levels and electrolyte levels. Dr. Fisher testified that he considered himself an expert in the treatment of hyponatremia in postoperative neurosurgery patients. He further stated that the care he rendered to Tiffani “absolutely met” the recognized standard of care for neurosurgeons. Dr. Fisher testified that there was never a consult with an internist or specialist in internal medicine because “none was needed.”
Toma, as the personal representative of Tiffani’s estate, sued Dr. Fisher, Dr. Fleming, and the Foundation (collectively “the Defendants”) on October 15, 2009, asserting a wrongful-death claim pursuant to the AMLA and alleging that the defendants had been negligent in the treatment and care rendered to Tiffani. Specifically, Toma alleged the following:
“Defendant physicians failed to perform within the standard of care, thereby causing loss, injury, and death to TIFFANI P. SMITH. Defendant health-care providers negligently, carelessly, wantonly, recklessly and willfully caused the wrongful death of TIFFANI P. SMITH at least in the following manner:
“Cerebral edema which caused central herniation of the brain due to massive doses of intravenous fluid causing cerebral edema and extreme hyponatremia; massive doses of corticosteroids contributing to the cerebral edema and sup *116 pressing the hypothalamic-pituitary-ad-renal axis causing adrenal insufficiency and hyponatremia; the administration of pipercillin I.V. to a patient with known penicillin allergy contributing to the cerebral edema; the administration of morphine sulfate I.V. which is known to cause increased intracranial pressure and undoubtedly added to the cerebral edema; and the administration of numerous antibiotics and substances which probably contributed to the cerebral edema.”
On December 8, 2010, the defendants moved the trial court for a summary judgment. Dr. Fisher and Dr. Fleming both contended that all treatment decisions relevant to the issues made the basis of the action were made by Dr. Fisher. Further, Dr. Fisher contended that he was a board-certified neurological surgeon practicing in the field of neurosurgery at all times relevant to the allegations made the basis of the complaint; that he was familiar with the standard of care required of surgeons in the field of neurosurgery in Alabama and the national medical community as that standard existed at the time he treated Tiffani; that in providing medical treatment to Tiffani he exercised that level of care, skill, and diligence as other similarly situated health-care providers in the same general line of practice ordinarily have exercised in like cases; that he did not fail to comply with the appropriate standard of care in any way; and that Tiffani’s death did not result from any breach of the applicable standard of care by him. Likewise, Dr. Fleming contended that at all times relevant to the allegations made the basis of the complaint he was a resident physician training in neurological surgery; that he was familiar with the standard of care required of resident surgeons in the field of neurosurgery in Alabama and the national medical community as that standard existed at the time he treated Tiffani; that in providing medical treatment to Tif-fani he exercised that level of care, skill, and diligence as other similarly situated health-care providers in the same general line of practice ordinarily have exercised in like cases; that he did not fail to comply with the appropriate standard of care in any way; and that Tiffani’s death did not result from any breach of the applicable standard of care by him. Additionally, the Foundation contended that it was entitled to a summary judgment because there was no predicate negligent act by Dr. Fisher or Dr. Fleming upon which it could be held vicariously liable.
On February 10, 2011, Toma filed a response in opposition to the defendants’ motion for a summary judgment. Toma supported his response to the motion for a summary judgment with the affidavits and deposition testimony of Dr. R. Douglas Collins and Dr. W. Robert Hudgins. Dr. Collins testified that he had been licensed to practice medicine in the State of Illinois since 2000, in the State of California since 1980, and in the State of Florida since 1976. Dr. Collins testified that he was board certified in internal medicine and in neurology and that, for one year immediately preceding the date of the occurrence made the basis of this action, he had treated patients at the Santa Rosa Correctional Institution in the general practice of medicine and in the practice of internal medicine and neurology.[8]
*117 Dr. Hudgins testified that he had been licensed to practice medicine in the State of Texas since 1973. He stated that he was board certified in neurological surgery and had done “many craniotomies (brain operations) for clipping of aneurysms over the years and [was] familiar with the management of these patients.” Dr. Hudgins testified that, during the one year immediately preceding the date of the occurrence of the events made the basis of this action, he had been involved in the general practice of medicine and the specific practice of neurological surgery.
Toma contended in his response to the motion for a summary judgment that the appropriate standard of care to be considered in this case is the standard of care that a doctor practicing internal medicine would exercise in monitoring, managing, and/or maintaining Tiffani’s electrolyte and fluid balance. Toma argued that the “breach of the standard of care occurred when [Dr. Fisher and Dr. Fleming] undertook the post-operative treatment, monitoring, managing, and maintaining [of Tif-fani’s] electrolyte and fluid balance, whose condition, known to Dr. Fisher, [was] such that continuous or frequent expert attention of an internist, an expert in monitoring, managing, and maintaining electrolyte and fluid balance, was necessary in order to monitor, manage, and maintain [Tiffa-ni’s] electrolyte and fluid balance.”
Dr. Collins testified that Dr. Fisher and Dr. Fleming had deviated from the appropriate standard of care for a board-certified internist in their care of Tiffani by ordering and administering massive doses of IV fluids, which caused severe hypona-tremia, which in turn caused cerebral edema resulting in a brain herniation and death; by ordering and administering massive doses of corticosteroids, which contributed to the cerebral edema and brain herniation; by ordering and administering morphine sulfate, which is known to cause increased intracranial pressure, which contributed to the cerebral edema and brain herniation; and by ordering and administering numerous antibiotics, which probably contributed to the cerebral edema and brain herniation.
Dr. Hudgins testified that Dr. Fisher and Dr. Fleming deviated from the applicable standard of care for similarly situated physicians by failing to take timely corrective steps to manage the hyponatre-mia. Dr. Hudgins opined that the “proper post-operative monitoring by [Dr. Fisher and Dr. Fleming] and/or timely reporting of the laboratory results showing [Tiffa-ni’s] sodium to be at critically low levels should have resulted in immediate consultations with an internist.” Dr. Hudgins stated that the appropriate diagnosis and treatment of hyponatremia, requires an understanding of the physiologic and pa-thophysiologic mechanisms involved in sodium and water homeostasis and that an internist has both the range and depth of knowledge to diagnose and treat hypona-tremia, whereas the condition may escape detection by a specialist. He further testified that internists often consult with neurosurgeons.
On April 11, 2011, the defendants filed a reply brief in support of their motion for a summary judgment and moved to strike the affidavit of Dr. Collins. The defendants argued that Dr. Collins should be precluded from testifying as an expert witness and his affidavit stricken because his affidavit was not based on personal knowledge from certified medical records; because sworn or certified copies of the medical records were not attached to the affidavit; because he lacked the requisite personal knowledge regarding lab values *118 upon which his expert opinions were based; and because he was board certified in internal medicine and, thus, was not a similarly situated health-care provider to Dr. Fisher and Dr. Fleming, who were practicing in the field of neurosurgery at all relevant times.
On July 3, 2012, the defendants filed a supplemental brief in support of their motion for a summary judgment. The defendants argued that Dr. Collins was not a similarly situated health-care provider because he was not a board-certified neurosurgeon and had not treated postoperative neurosurgery patients as a neurologist within the year preceding the events made the basis of this action. The defendants argued that Dr. Hudgins was unqualified to testify as a similarly situated healthcare provider because he had stopped doing craniotomies in 2004 and had stopped doing aneurysm clippings in the late 1980s.
As to Dr. Fleming, the defendants noted that Dr. Hudgins had opined in his deposition that if the resident physician had contacted the attending physician and had given the patient’s relevant condition and information to the attending physician then the resident physician had discharged his duty to the patient. The defendants argued that it is undisputed that Dr. Fleming immediately informed Dr. Fisher of Tiffani’s relevant information and condition upon first discovering her being in distress and, therefore, had discharged his duty and was entitled to a summary judgment.
Finally, although the defendants argued that Dr. Hudgins was not qualified to testify as a similarly situated health-care provider regarding the applicable standard of care, they conceded that he might be qualified to testify as to causation. The defendants noted that Dr. Hudgins’s main criticism of Dr. Fisher and Dr. Fleming was that they did not consult with an internist while providing Tiffani medical treatment.
However, the defendants contended that, when questioned as to whether a consult with an internist would have prevented Tiffani’s death, Dr. Hudgins was unsure and could not testify to a reasonable degree of medical probability. Thus, the defendants argued, Toma had failed to establish causation and they were, therefore, entitled to a summary judgment.
Also on July 3, 2012, the defendants renewed their motion to strike the affidavits of Dr. Collins and Dr. Hudgins. On August 19 and 20, 2012, Toma filed amended affidavits of Dr. Collins and Dr. Hud-gins in response to the renewed motion by the defendants to strike their previously submitted affidavits.
On August 20, 2012, Toma supplemented his response to the defendants’ motion for a summary judgment, arguing that Dr. Hudgins was a similarly situated healthcare provider, that Dr. Hudgins had established causation, and that Dr. Fleming was not entitled to a summary judgment.
Also on August 20, 2012, the defendants filed a motion in limine to preclude the testimony of Dr. Collins regarding the applicable standard of care because, they asserted, Dr. Collins was an “internal medicine physieian/neurologist [and] it is undisputed that he has never practiced neurosurgery.” The defendants also sought to preclude the testimony of Dr. Hudgins, arguing that he was not a similarly situated health-care provider as defined by the AMLA. On August 21, 2012, Toma filed a response in opposition to the motion in limine arguing that both Dr. Collins and Dr. Hudgins were qualified to testify under the AMLA. On August 24, 2012, the trial court entered an order denying the defendants’ renewed motions to strike the affidavits of Dr. Collins and Dr. Hudgins.
Also on August 24, 2012, the trial court entered an order granting the defendants’ *119 motion for a summary judgment as to Dr. Fleming and denying the motion for a summary judgment as to Dr. Fisher and the Foundation.
The trial court found that there was no genuine issue of material fact as to whether Dr. Fleming had breached the appropriate standard of care for a resident physician practicing neurosurgery and performing postoperative care of a neurosurgical patient. Specifically, the trial court relied on the deposition testimony of Toma’s expert. Dr. Hudgins, who testified that Dr. Fleming had discharged his duty to Tiffani by immediately contacting Dr. Fisher to advise him of the pertinent information regarding Tiffani’s condition.
Regarding Dr. Fisher and the Foundation, the trial court found that the applicable standard of care alleged to have been breached was that of “a neurosurgeon performing postoperative care of a neuro-surgical patient,” that Dr. Collins did not specialize in neurosurgery, and that Dr. Collins was not a similarly situated healthcare provider to Dr. Fisher at the time of the alleged breach of the standard of care. Therefore, the trial court concluded, Dr. Collins could not testify as to the alleged breach of the standard of care. However, the trial court also determined that Dr. Collins had offered causation testimony that was not specifically addressed by the defendants’ motion for a summary judgment and, thus, that Dr. Collins could testify as to causation at trial. Furthermore, the trial court determined that Dr. Hud-gins was a similarly situated health-care provider at the time of the alleged breach and that he had testified that Dr. Fisher had breached the appropriate standard of care by failing to consult with an internist when Tiffani began showing signs of confusion and disorientation. Thus, the trial court concluded that Dr. Fisher and the Foundation were not entitled to a summary judgment on Toma’s claims.
The case proceeded to trial on August 27, 2012. On August 28, 2012, the trial court disposed of several pending motions; among other things, it granted the defendants’ motion in limine as it related to precluding Dr. Collins from testifying as to the standard of care and denied the motion in limine as it related to precluding Dr. Hudgins from testifying as to the standard of care. The defendants moved the trial court for a preverdict judgment as a matter of law (“JML”) at the close of Toma’s evidence and then again at the close of all the evidence. The trial court denied both motions. On August 31, 2012, the jury returned a verdict in favor of Dr. Fisher and the Foundation. On September 4, 2012, the trial court entered a final judgment on the jury’s verdict in favor of Dr. Fisher and the Foundation.
On October 3, 2012, Toma moved the trial court for a new trial or, in the alternative, to alter, amend, or vacate the judgment entered in this case. Toma argued that the trial court had erred by entering a summary judgment in favor of Dr. Fleming because Dr. Collins had identified numerous breaches of the appropriate standard of care by Dr. Fleming and that the trial court had “improperly focused on one narrow aspect of Dr. Fleming’s care to excuse him from all liability by way of summary judgment.” Toma also argued that the trial court had erred in not allowing Dr. Collins to testify as to the appropriate standard of care applicable to Dr. Fisher. Toma contended that the postoperative monitoring of Tiffani’s fluid and electrolyte levels was an issue of internal medicine rather than neurosurgery and that, because he was board certified in internal medicine, Dr. Collins was a similarly situated health-care provider capable of testifying as to Dr. Fisher’s alleged *120 breach of the standard of care relevant to his postoperative monitoring of Tiffani.
On November 9, 2012, the defendants, citing § 43-2-211 et seq., Ala.Code 1975, moved the trial court to dismiss the complaint against them as being void ab initio, arguing that Toma had failed to qualify as the personal representative of Tiffani’s estate in the State of Alabama.[9]
On November 21, 2012, the trial court entered an order denying Toma’s post-judgment motion for a new trial or, in the alternative, to alter, amend, or vacate the judgment entered in this case. On that same date, the trial court entered an order denying the defendants’ motion to dismiss. Toma appeals, and Dr. Fisher and the Foundation cross-appeal. These appeals have been consolidated for the purpose of issuing one opinion.

Discussion

I. Case No. 1120⅛⅛5

Toma argues that the trial court exceeded its discretion when it found that Dr. Collins was not a similarly situated health-care provider and refused to allow him to testify as to Dr. Fleming’s and Dr. Fisher’s alleged breaches of the standard of care. We note that the trial court enjoys discretion when determining whether a witness is qualified to testify as an expert in a medical-malpractice action under § 6-5-548, Ala.Code 1975. Biggers v. Johnson, 659 So.2d 108 (Ala.1995). See also Holcomb v. Carraway, 945 So.2d 1009 (Ala.2006).
Section 6-5-548, a part of the AMLA, provides, in relevant part:
“(a) In any action for injury or damages or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care, the plaintiff shall have the burden of proving by substantial evidence that the health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice ordinarily have and exercise in a like case.
“(b) Notwithstanding any provision of the Alabama Rules of Evidence to the contrary, if the health care provider whose breach of the standard of care is claimed to have created the cause of action is not certified by an appropriate American board as being a specialist, is not trained and experienced in a medical specialty, or does not hold himself or herself out as a specialist, a ‘similarly situated health care provider’ is one who meets all of the following qualifications:
“(1) Is licensed by the appropriate regulatory board or agency of this or some other state.
“(2) Is trained and experienced in the same discipline or school of practice.
“(3) Has practiced in the same discipline or school of practice during the year preceding the date that the alleged breach of the standard of care occurred.
“(c) Notwithstanding any provision of the Alabama Rules of Evidence to the contrary, if the health care provider whose breach of the standard of care is claimed to have created the cause of action is certified by an appropriate American board as a specialist, is trained and experienced in a medical specialty, and holds himself or herself out as a specialist, a ‘similarly situated health care provider’ is one who meets all of the following requirements:
*121 “(1) Is licensed by the appropriate regulatory board or agency of this or some other state.
“(2) Is trained and experienced in the same specialty.
“(3) Is certified by an appropriate American board in the same specialty.
“(4) Has practiced in this specialty during the year preceding the date that the alleged breach of the standard of care occurred.”
As to the determination whether a defendant health-care provider is a specialist for purposes of § 6-5-548(b) and (c), this Court has stated:
“ ‘In order to determine whether the defendant health-care provider qualifies as a specialist, we must first determine the field of medical practice in which the negligence is alleged to have occurred. If the defendant health-care provider is a specialist in the field of practice in which the alleged negligence occurred, then the proffered expert witness must also be a specialist in that field, under § 6 — 5—548(c), Ala.Code 1975. See also Medlin v. Crosby, 583 So.2d 1290, 1293 (Ala.1991).’ ”
Hegarty v. Hudson, 123 So.3d 945, 950 (Ala.2013), quoting Holcomb v. Carraway, 945 So.2d 1009,1013 (Ala.2006).
It is undisputed that Dr. Fisher was a board-certified specialist in the field of neurological surgery. However, Toma argues on appeal, as he did in the trial court, that Dr. Fisher was not practicing his specialty of neurological surgery at the time he provided postoperative care to Tif-fani. Rather, Toma argues that Dr. Fisher had undertaken the practice of internal medicine, because, he asserts, “the postoperative treatment, monitoring, managing, and maintaining [of Tiffani’s] electrolyte and fluid balance, whose condition, known to Dr. Fisher, [was] such that continuous or frequent expert attention of an internist, an expert in monitoring, managing, and maintaining electrolyte and fluid balance, was necessary in order to monitor, manage, and maintain [Tiffani’s] electrolyte and fluid balance.” Thus, Toma contends that, because Dr. Collins was a board-certified physician in the specialty of internal medicine, he was a similarly situated health-care provider to Dr. Fisher for purposes of the AMLA and was eligible to testify as to the alleged breach of the standard of care.
As mentioned above, Dr. Fisher was a board-certified physician in the specialty of neurosurgery. The events made the basis of this action occurred while Dr. Fisher was administering postoperative care to Tiffani following a craniotomy to repair an aneurysm. It is undisputed that the postoperative care of a neurosurgical patient following an aneurysm repair involves the management of fluid and electrolyte balance, which requires the close monitoring of the patient’s sodium levels. Dr. Fisher testified that he considered himself an expert in the treatment of postoperative neu-rosurgical patients, including the treatment of hyponatremia in those patients. Therefore, we cannot say that the trial court erred in determining that the appropriate standard of care to be considered was that of “a neurosurgeon performing post-operative care of a neurosurgical patient,” because the evidence supports the conclusion that Dr. Fisher was a specialist and was practicing within the field of his specialization as a neurosurgeon while administering postoperative care to Tiffani. Therefore, § 6-5-548(c) is applicable.
Because the evidence supports the conclusion that Dr. Fisher was a specialist in neurosurgery for the purposes of § 6-5-548(c), the requirements found in § 6-5-548(e) are applicable and must be satisfied before a health-care provider can be con *122 sidered a “similarly situated health care provider” for purposes of offering expert testimony as to the standard of care applicable to Dr. Fisher. Hegarty, supra. Section 6-5-548(e) provides:
“(e) The purpose of this section is to establish a relative standard of care for health care providers. A health care provider may testify as an expert witness in any action for injury or damages against another health care provider based on a breach of the standard of care only if he or she is a ‘similarly situated health care provider’ as defined above. It is the intent of the Legislature that in the event the defendant health care provider is certified by an appropriate American board or in a particular specialty and is practicing that specialty at the time of the alleged breach of the standard of care, a health care provider may testify as an expert witness with respect to an alleged breach of the standard of care in any action for injury, damages, or wrongful death against another health care provider only if he or she is certified by the same American board in the same specialty.”
Dr. Fisher was a board-certified specialist in neurosurgery and was practicing that speciality at the time of the alleged breach of the standard of care. Dr. Collins was a board-certified specialist in internal medicine and was not a board-certified specialist in neurosurgery. Thus, pursuant to § 6-5-548(e), Dr. Collins was not a similarly situated health-care provider to Dr. Fisher and could not have properly testified as an expert witness as to the standard of care applicable to Dr. Fisher. Additionally, we note that any overlap or similarity in the practice of a board-certified neurosurgeon and a board-certified specialist in internal medicine, i.e., the monitoring of fluid and electrolyte levels in patients, is irrelevant to this determination. This Court has held:
‘“The fact that [two certifying boards] may have the same purpose, that they may certify providers for the same procedures, or that they may require the same qualifications would be irrelevant. Section 6-5-548(e) plainly states that if the two providers are not certified by the same organization, then one cannot testify as to the standard of care applicable to the other.’ ”
Hegarty, 123 So.3d at 951, quoting Johnson v. Price, 743 So.2d 436, 438 (Ala.1999).
Based on the foregoing, we conclude that the trial court did not exceed its discretion in prohibiting Dr. Collins from testifying as an expert witness as to the standard of care alleged to have been breached by Dr. Fisher because Dr. Collins was not a similarly situated healthcare provider to Dr. Fisher.
Toma also argues that the trial court erred in entering a summary judgment in favor of Dr. Fleming. Our standard of review of a summary judgment is well settled:
“ ‘The standard of review applicable to a summary judgment is the same as the standard for granting the motion.... ’ McClendon v. Mountain Top Indoor Flea Market, Inc., 601 So.2d 957, 958 (Ala.1992).
“ ‘A summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. The burden is on the moving party to make a prima facie showing that there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law. In determining whether the movant has carried that burden, the court is to view the evidence in a light most favorable to the *123 nonmoving party and to draw all reasonable inferences in favor of that party. To defeat a properly supported summary judgment motion, the nonmoving party must present ‘substantial evidence’ creating a genuine issue of material fact — ‘evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ Ala.Code 1975, § 12-21-12; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989).’
“Capital Alliance Ins. Co. v. Thorough-Clean, Inc., 639 So.2d 1349, 1350 (Ala.1994). Questions of law are reviewed de novo. Alabama Republican Party v. McGinley, 893 So.2d 337, 342 (Ala.2004).”
Pritchett v. ICN Med. Alliance, Inc., 938 So.2d 933, 935 (Ala.2006).
This Court has stated:
“ ‘To prevail on a medical-malpractice claim, a plaintiff must prove “ T) the appropriate standard of care, 2) the doctor’s deviation from that standard, and 3) a proximate causal connection between the doctor’s act or omission constituting the breach and the injury sustained by the plaintiff.’ ” Pruitt [v. Zeiger], 590 So.2d [236,] 238 [(Ala.1991) ] (quoting Bradford v. McGee, 534 So.2d 1076, 1079 (Ala.1988)).’ Giles v. Brookwood Health Seros., Inc., 5 So.3d 533, 549 (Ala.2008).
“ ‘A plaintiff in a medical-malpractice action must ... present expert testimony establishing a causal connection between the defendant’s act or omission constituting the alleged breach and the injury suffered by the plaintiff. Pruitt v. Zeiger, 590 So.2d 236, 238 (Ala.1991). See also Bradley v. Miller, 878 So.2d 262, 266 (Ala.2003); University of Alabama Health Servs. Found,., P.C. v. Bush, 638 So.2d 794, 802 (Ala.1994); and Bradford v. McGee, 534 So.2d 1076, 1079 (Ala.1988). To prove causation in a medical-malpractice case, the plaintiff must demonstrate “ ‘that the alleged negligence probably caused, rather than only possibly caused, the plaintiffs injury.’” Bradley, 878 So.2d at 266 (quoting University of Alabama Health Seros., 638 So.2d at 802).’
“Sorrell v. King, 946 So.2d 854, 862 (Ala.2006).”
Breland v. Rich, 69 So.3d 803, 814-15 (Ala.2011).
The defendants supported their motion for a summary judgment with the affidavits of Dr. Fleming and Dr. Fisher. Both Dr. Fisher and Dr. Fleming testified that Dr. Fleming monitored Tiffani and kept Dr. Fisher informed of her condition but that all decisions relevant to the treatment of Tiffani were made by Dr. Fisher, because he was the attending physician. Dr. Fleming also testified that at all times relevant to the allegations made the basis of the complaint he was a resident physician training in neurological surgery; that he was familiar with the standard of care required of resident surgeons in the field of neurosurgery in Alabama and the national medical community as that standard existed at the time he treated Tiffani; that in providing medical treatment to Tiffani he exercised that level of care, skill, and diligence as other similarly situated healthcare providers in the same general line of practice ordinarily have exercised in like cases; that he did not fail to comply with the appropriate standard of care in any way; and that Tiffani’s death did not result from any breach of the applicable standard of care by him.
Additionally, the defendants presented the deposition testimony of Dr. Hudgins, *124 in which he testified that if a resident physician contacted the attending physician and provided the attending physician with the patient’s relevant information, then the resident physician had discharged his duty to the patient. Specifically, Dr. Hudgins testified as follows regarding Dr. Fleming:
“Q. Would you expect [a resident physician] to be responsible for the decisions of getting a consult?
“A. Well, I — I do think even a first year resident, if he starts to notice things are going wrong and the nurses are telling him that something’s out of— not — normal, then he should at least go ahead and deal with it or call his supervisor, his — whoever he’s working under at that point and discuss it with him.
“Q. If he calls his supervising attending physician and discusses it with him, he has discharged his duty?
“A. Probably.
“Q. Would that be true for a second or third year resident? If they have called the attending and discussed it with them, have they discharged their duty?
“A. Yes.”
Dr. Hudgins later reiterated his opinion:
“Q. Okay. But you also told me earlier that if the resident contacted the attending and gave him the pertinent information and the attending made the decision, that the resident had discharged his duty; is that correct?
“A. Yes, I said that.
“Q. And — and that is true, isn’t it? You still agree with that, don’t you?
“A. Yes, I think so.
“Q. Okay. Well, you think so or — I mean, that’s the way it is?
“A. I agree—
“Q. Okay.
“A. —yes, sir.
The trial court relied on this testimony of Dr. Hudgins to determine that Dr. Fleming had not breached the standard of care applicable to him and, thus, was entitled to a summary judgment.
Toma argues that the trial court erred in focusing solely on this testimony because, he says, there was other evidence presented that created a question of fact as to whether Dr. Fleming breached the standard of care. Toma first points to testimony taken from the trial that, he says, indicates that Dr. Fleming had undertaken the treatment of Tiffani and had made decisions during the course of that treatment. Obviously, that evidence was not before the trial court at the time it considered the defendants’ motion for a summary judgment and cannot now be considered in reviewing the propriety of the summary judgment. In determining whether there is a question of material fact sufficient to defeat a motion for a summary judgment, the courts, both trial and appellate, must consider only the evidence before the trial court at the time it ruled upon the motion for a summary judgment. Ex parte Alabama Dep’t of Mental Health & Mental Retardation, 937 So.2d 1018,1022 (Ala.2006).
Second, Toma points to the affidavit and deposition testimony of Dr. Collins, in which Dr. Collins testified that Dr. Fleming had deviated from the appropriate standard of care in his treatment of Tiffani, to support his contention that other evidence existed that created a question of fact as to whether Dr. Fleming breached the standard of care. Dr. Fleming was a resident physician training in neurological surgery; he was not a specialist in that field of practice. Because Dr. Fleming was not a specialist in the field of neurosurgery, § 6-5-548(b) is applicable to determine whether Dr. Collins was a similar *125 ly situated health-care provider to Dr. Fleming and thus permitted to give expert testimony as to the applicable standard of care. In order to be considered a similarly situated health-care provider pursuant to § 6-5-548(b), a witness must meet all of the following requirements:
“(1) Is licensed by the appropriate regulatory board or agency of this or some other state.
“(2) Is trained and experienced in the same discipline or school of practice.
“(8) Has practiced in the same discipline or school of practice during the year preceding the date that the alleged breach of the standard of care occurred.”
Dr. Collins was not trained or experienced in the practice of neurosurgery. Further, Dr. Collins had not treated a postoperative neurosurgical patient within the year preceding the events giving rise to this action. Dr. Collins practiced general internal medicine and neurology at the Santa Rosa Correctional Institution in Florida during the year preceding the events giving rise to this action. Dr. Collins testified that he last went into a hospital for the purposes of treating a postoperative neurosurgical patient in 1997. He further testified that he last took care of an aneurysm patient for any reason in 1994 or 1995. Accordingly, Dr. Collins was not a similarly situated health-care provider to Dr. Fleming and was not qualified to testify as an expert witness as to any alleged breach of the standard of care.
Third, Toma relies on Dr. Hudgins’s affidavit, in which he stated that “there was a failure on the part of the surgeon and his team” to take corrective measures in treating Tiffani’s hyponatremia. This statement was based on Dr. Hudgins’s opinion that Dr. Fisher and Dr. Fleming should have consulted an internist to manage the hyponatremia. However, it is undisputed that it was Dr. Fisher and not Dr. Fleming who made the decisions relevant to Tiffa-ni’s treatment in regard to whether to consult an internist in this case.
Finally, Toma points to Dr. Fleming’s and Dr. Hudgins’s depositions, which he claims indicate that Dr. Fleming was actually rendering care and treatment to Tiffani. Although this may be correct, evidence indicating that Dr. Fleming was actually rendering treatment does not address or rebut Dr. Hudgins’s own testimony that Dr. Fleming discharged his duty in this case by immediately notifying Dr. Fisher of Tiffani’s change in condition.
Based on foregoing, we conclude that the trial court did not err in entering a summary judgment in favor of Dr. Fleming.

II. Case No. 1120170

Dr. Fisher and the Foundation cross-appeal, raising several issues for our consideration. Dr. Fisher and the Foundation argue that the trial court erred in granting Toma’s motions to continue pursuant to Rule 56(f), Ala. R. Civ. P.; that the trial court erred in not granting the motion for a summary judgment as it applied to Dr. Fisher and the Foundation; and that the trial court erred in not granting the pre-verdict motion for a JML as it pertained to Dr. Fisher and the Foundation. Because of our resolution of the issues presented in case no. 1120445, we pretermit discussion of these three issues raised on cross-appeal. However, Dr. Fisher and the Foundation do raise an issue on cross-appeal that touches on Toma’s capacity to bring the underlying action. Therefore, because this issue could affect jurisdiction, out of an abundance of caution we will address it.
Dr. Fisher and the Foundation argue that the trial court erred in denying their postverdict motion to dismiss challenging Toma’s capacity to sue based on § 43-2- *126 211 et seq., Ala.Code 1975. Section 43-2-211 provides:
“Any executor or administrator who has obtained letters testamentary or of administration on the estate of a person who was not, at the time of his death, an inhabitant of this state, in any other of the United States, and who has not obtained letters of administration thereon in this state, as authorized by article 8 of chapter 2 of this title, may maintain civil actions and recover or receive property in this state:
“(1) By recording, at any time before judgment or the receipt of the property, a copy of his letters, duly authenticated according to the laws of the United States, in the office of the judge of probate of the county in which such civil action is brought or property received; or
“(2) By giving bond, with at least two good and sufficient sureties, payable to and approved by such judge of probate, in such amount as he may prescribe, to be determined with reference to the value of the property to be recovered or received and conditioned to faithfully administer such recovery or property according to law.”
They further argue that Toma failed to prove that he had complied with the requirements of § 43-2-21. Section 43-2-213 provides:
“Before a judgment is rendered in a civil action brought by such foreign executor or administrator, the plaintiff must prove that he has complied in all respects with the provisions of section 43-2-211, and, failing to do so, he cannot recover.”
Accordingly, Dr. Fisher and the Foundation argue that the action is due to be dismissed as being void ab initio.
The same issue was addressed by this Court as an issue of first impression in Halas v. Partin, 278 Ala. 65, 175 So.2d 759 (1965), in which this Court determined that a deceased’s representative may maintain a cause of action pursuant to the wrongful-death statute without first obtaining ancillary appointment pursuant to the Code provisions applicable to the administration of estates. This Court explained its reasoning as follows:
“We start with the proposition that at common law no suit can be maintained by an administrator in his official capacity except within the limits of the state from which he derived his authority; Jefferson v. Beall, 117 Ala. 436, 23 So. 44 [ (1898) ]; Lawrence v. Nelson, 143 U.S. 215, 12 S.Ct. 440, 36 L.Ed. 130 [ (1892) ]; and a second proposition that in Alabama a cause of action for wrongful death is not property. Holt v. Stollenwerck, 174 Ala. 213, 56 So. 912 [ (1892) ], and Breed v. Atlanta, B. & C.R. Co., 241 Ala. 640, 4 So.2d 315 [ (1941) ]. Unless our statutes give a foreign administrator permission to file and maintain a suit under a wrongful death statute, the trial court was correct in sustaining the pleas in abatement.
“We look first at the wrongful death statute, Tit. 7, § 123, Code 1940:
“ ‘A personal representative may maintain an action, and recover such damages as the jury may assess in a court of competent jurisdiction within the state of Alabama, and not elsewhere for the wrongful act, omission, or negligence of any person or persons, or corporation, his or their servants or agents, whereby the death of his testator or intestate was caused, if the testator or intestate could have maintained an action for such wrongful act, omission, or negligence, if it had not caused death. Such action shall not abate by the death of the defendant, but may be revived against *127 his personal representative; and may be maintained, though there has not been prosecution, or conviction, or acquittal of the defendant for the wrongful act, or omission, or negligence; and the damages recovered are not subject to the payment of the debts or liabilities of the testator or intestate, but must be distributed according to the statute of distributions. Such action must be brought within two years from and after the death of the testator or intestate.’
“The words ‘personal representative’ are broader in some respects, but when used in this statute, they can only mean the executor or administrator of the injured testator or intestate.
“This statute authorizes suit to be brought by the personal representative for a definite legislative purpose—to prevent homicide. [‘] prosecuting such actions, the personal representative does not act strictly in his capacity as administrator of the estate of his decedent, because he is not proceeding to reduce to possession the estate of his decedent, but rather he is asserting a right arising after his death, and because the damages recovered are not subject to the payment of the debts or liabilities of the decedent. He acts rather as an agent of legislative appointment for the effectuation of the legislative policy, ... And the right is vested in the personal representative alone. No one else, under any circumstances except in the case of the death of a minor child, [’] where Tit. 7, § 119 [‘jgives a preferred right to the father or mother, can maintain the action in any forum.[’j Holt v. Stollenwerck, 174 Ala. 213, 56 So. 912 [ (1892) ]. ‘The only right or duty the administrator has is to maintain the suit, and collect the damages and pay them over to the distributees. He is a mere agency and conduit, provided by the statute for bringing the suit, collecting the damages, and passing them over to those entitled thereto.’ Kennedy v. Davis, 171 Ala. 609, 55 So. 104 [ (1911) ].
“The following excellent annotation is found in 52 A.L.R.2d 1057:
“ ‘In the absence of a statute denying a foreign representative’s capacity to sue, it has been generally held that where recovery is sought for the benefit of beneficiaries designated in the forum’s death statute, and not for the benefit of the deceased’s estate, a foreign personal representative has the capacity to maintain an action under the forum’s death statute providing for action by the personal representative. (Citing authorities)
“ ‘From the cases cited above, it appears that the reason for allowing a foreign personal representative to sue under a death statute, notwithstanding the rule that a personal representative as such may not sue outside of the jurisdiction in which he is appointed, without ancillary appointment in the state of the forum, is that under statutes like Lord Campbell’s Act, creating a new cause of action (as distinguished from one merely preserving the right of action in favor of the deceased to his personal representative), the recovery to go not to the estate to be distributed as a part thereof, but to designated beneficiaries, the personal representative sues not in his capacity as such, but in the capacity of a trustee for such beneficiaries, and, as the doctrine denying the personal representative the right to sue in a jurisdiction other than that of his appointment is predicated on the idea that local creditors must be first satisfied before the representative may be permitted to recover local assets and remit them to another ju *128 risdiction, the reason for the rule ceases to exist when the recovery is not subject to claims of deceased’s creditors, but is to be distributed among the statutory beneficiaries.’”
Hatas, 278 Ala. at 67-68,175 So.2d at 760-62.
Accordingly, we cannot say that the trial court erred in denying the defendants’ postverdict motion to dismiss based on their contention that Toma lacked the capacity to bring the underlying action.

Conclusion

We affirm the summary judgment entered in favor of Dr. Fleming and the judgment entered on the jury verdict in favor of Dr. Fisher and the Foundation. We also affirm the trial court’s order denying the defendants’ postverdict motion to dismiss, and we pretermit discussion of the remaining issues raised in the cross-appeal.
1120445 — AFFIRMED.
1120470 — AFFIRMED.
MOORE, C.J., and MURDOCK, MAIN, and BRYAN, JJ., concur.

. The record reflects that the normal sodium level range is between 133-145 mEq/L.

. As will be discussed infra, Tiffani went into respiratory arrest at approximately 8:00 a.m. It is unclear how much of the 500 cc’s of normal saline fluid ordered by Dr. Fleming that Tiffani received before going into respiratory arrest. However, Dr. Fleming testified that it was doubtful that she received the full 500 cc's.

.A "MET” team is an emergency resuscitation team. The MET team administered additional normal saline fluids to Tiffani while resuscitating her, but it is unclear how much fluid she received at that time.

. The record reflects that vasospasm occurs when blood leaves the vessels, as in the case of a ruptured aneurysm, which causes the blood vessels to constrict, resulting in the flow of blood to the brain being restricted. Edema develops when the brain begins to shut down from lack of blood flow. Vasospasm is not common in unruptured aneurysms.

. The cause of Tiffani’s death will be discussed in greater detail below.

. Hypertonic saline contains a higher concentration of sodium (3% per liter) than normal saline (0.9% per liter) and has to be administered in the NICU so that it can be closely monitored. The templated computerized ordering system in use by the hospital at the time required a sodium level of less than 120 mEq/L, or "severe hyponatremia,” in order to obtain the hypertonic saline. Hyponatremia is an electrolyte disturbance in which the sodium concentration in the blood serum is low. In order to expedite the procurement of the hypertonic saline in the rapidly developing crisis, a nurse, at Dr. Fleming’s direction and per Dr. Fisher's order, indicated on the templated order that Tiffani had a sodium *115 level of less than 120 mEq/L. Both Dr. Fleming and Dr. Fisher testified that Tiffani’s sodium level never dropped below 128 mEq/L.

. The foramen magnum is an opening at the base of the skull through which the spinal cord connects to the brain.

. Relying on Medlin v. Crosby, 583 So.2d 1290 (Ala.1991), Toma argued that Dr. Collins could testify as a similarly situated healthcare provider and give his expert opinion regarding the alleged breach of the standard of care despite not being a board-certified neurosurgeon because, he said, although Dr. Fisher was a board-certified neurosurgeon, the appropriate standard of care to be consid *117 ered in this case is the standard applicable to an internist.

. This issue was initially raised as a defense in the defendants’ answer.